# EXHIBIT 2

1   Gary D. Sharp (SBN 116216)
    gsharp@foleymansfield.com
2   T. Eric Sun (SBN 187486)
    esun@foleymansfield.com
3   Andrew L. Sharp (SBN 292541)
    asharp@foleymansfield.com
4   **FOLEY & MANSFIELD, PLLP**
5   2185 North California Blvd., Suite 575
    Walnut Creek, CA  94596
6   Telephone:   (510) 590-9500
    Facsimile:   (510) 590-9595
7
    Attorneys for Defendant
8   **CROSBY VALVE, LLC**

9                    **UNITED STATES DISTRICT COURT**

10                   **NORTHERN DISTRICT OF CALIFORNIA**

11
    DENNIS HALE and LORA HALE,              Case No.:
12
                   Plaintiffs,              Superior Court Case No.:      CGC-21-276981
13
             vs.
14                                          **DECLARATION OF**
    AIR & LIQUID SYSTEMS CORP.,             **CHRISTOPHER P. HERFEL**
15  individually and as successor-in-interest to
    Buffalo Pumps, Inc.; ALFA LAVAL INC.,
16  f/k/a The DeLaval Separator Company;
    ARMSTRONG INTERNATIONAL, INC.;
17  BW/IP, INC.; CBS CORPORATION, a
    Delaware Corporation, f/k/a Viacom Inc.,
18  Successor by Merger to CBS Corporation, a
    Pennsylvania Corporation, f/k/a
19  Westinghouse Electric Corporation;
    CLARK-RELIANCE CORPORATION, as
20  successor-in-interest to Jerguson Gauge and
    Valve; CRANE CO., individually and as
21  successor-in-interest to Stockham Valves &
    Fittings Company, Chapman Valve Mfg.
22  Co. and Alloy Steel Products Co.;
    CROSBY VALVE, INC.; CUMMINS
23  INC.; ELLIOT COMPANY;
    FLOWSERVE US, Inc., as successor-in-
24  interest to Durametallic Corporation;
    FLOWSERVE US, INC., as successor-in-
25  interest to Edward Vogt Valve Co., Vogt
    Valve Company, Edward Valves, Inc.,
26  Nordstrom Audco, Inc., Nordstrom Valves,
    Inc., Rockwell Manufacturing Co.; FMC
27  CORPORATION, individually and as
    successor-in-interest to Peerless Pump,
28  Turbo Pump Operation, and Chicago Pump;

                                    1
                   DECLARATION OF CHRISTOPHER P. HERFEL

FOSTER WHEELER LLC. f/k/a Foster Wheeler USA Corporation; GARDNER DENVER, INC., individually and as successor-in-interest to Joy Manufacturing Co.; GENERAL ELECTRIC COMPANY; IMO INDUSTRIES INC.; ITT LLC, f/k/a ITT, INC., f/k/a ITT CORPORATION, individually and as successor-in-interest to Bell & Gossett, Kennedy Valve Manufacturing Co., McDonnell & Miller, Fabri-Valve, Hoffman Specialty Manufacturing Co.; JOHN-CRANE, INC., individually and as successor-in-interest to CRANE PACKING COMPANY; KAISER GYPSUM COMPANY, INC.; MUELLER STEAM SPECIALTY; NAVISTAR,.INC.; PACCAR, INC.; PARKER HANNIFIN CORPORATION, individually and as successor-in interest to Sacomo-Sierra, Parker Seal Company; and Rockwell Mechanical Packing; SERVICE ENGINEERING CO.; STERLING FLUID SYSTEMS (USA) LLC, dba and individually and as successor-in-interest to PEERLESS PUMP COMPANY and INDIAN HEAD, INC.; THE GOODYEAR TIRE & RUBBER COMPANY; THE WILLIAM POWELL COMPANY; TRIPLE A MACHINE SHOP, INC.; VELAN VALVE CORP.; VIKING PUMP, INC.; VOLVO TRUCKS NORTH AMERICA, INC.; WARREN PUMPS LLC, individually and as successor-in-interest to WARREN PUMPS, INC.; WEIR VALVES & CONTROLS USA, INC. f/k/a ATWOOD & MORRILL; WELCO MANUFACTURING COMPANY; and DOES 1-500;

Defendants.

I, CHRISTOPHER P. HERFEL, declare under the penalty of perjury that the following facts are true and correct.

1.      I am over the age of 18 and make this declaration based on information and belief and I am competent to testify on the matters contained herein.

2.      Attached as **Exhibit 1** is a true and correct copy of my curriculum vitae, which details my educational background, work history and qualifications. My formal education includes a Bachelor of Science degree from the U.S. Merchant Marine Academy, Kings Point, New York,

in Marine Engineering with a minor in Shipyard Engineering Management. In 2004, I received a Master of Business Administration (MBA) from Loyola University Maryland. I also currently hold a Third Assistant Engineer's License, Steam & Diesel Propulsion, Unlimited Horsepower, issued by the U.S. Coast Guard.

3.     During my junior year at the Merchant Marine Academy, I was selected to pursue specialization in shipbuilding and ship repairs entitled, "Shipyard Engineering Management." In addition to completing the required curriculum in Marine Engineering, I was required to take a unique subset of academic courses that focused specifically on the ship construction and ship repair industry. This included classes in advanced naval architecture, process and workflow operations, marine economics, critical path methodology scheduling, ship construction techniques and advanced welding and metallurgy theory. A yearlong capstone project was also required by this minor, in which I recreated the shipyard overhaul and repair availability of a U.S. Navy ship from preliminary planning through final sea trials. Additionally, between my junior and senior years, I completed a six-week-long internship with a ship repair activity overseeing the overhaul of USS Supply (AOE 6).

4.     After graduating from the Merchant Marine Academy, 1 served as an Officer in the United States Naval Reserve for eight years, obtaining the rank of Lieutenant. I was designated as a Marine Engineer (1675 designator) and was assigned to the United States Naval Reserve, Merchant Marine Ready Reserve (USNR MMR). During my Naval Reserve career, I gained valuable experience and expertise in maintenance, upkeep, activation, and deactivation of U.S. Navy and merchant ships located in Ready Reserve Fleet. Additionally, while assigned to Active Duty Training, I successfully completed the National Sealift Training Program for Engineers training course. During this training, students received advanced training in shipboard systems and typical problems that occur while activating and maintaining Reserve Operating Status (ROS) 4 and ROS 5 ships as well as Ready Reserve Fleet (RRF) 10, 20 and 30 ships. During Active Duty Training, I also successfully completed several U.S. Navy correspondence training courses which focused on ship maintenance and repairs, marine engineering economics, and management of time and cost in shipbuilding projects.

DECLARATION OF CHRISTOPHER P. HERFEL

5. I am currently the President/CEO of McCaffery & Associates, Inc., a firm that specializes in the research and analysis of U.S. Navy, Coast Guard and other federal government agency documents, records, plans, photographs and publications regarding ship design, construction, maintenance, repair and conversion. In addition, the firm also provides research and analysis of similar records and documents regarding naval and merchant marine personnel training, government contracting and purchasing, personnel safety and health, use of asbestos on naval ships, government specifications for the use of asbestos on naval ships and knowledge of the federal government and Navy concerning the hazards of asbestos.

6. Prior to joining McCaffery & Associates, I was employed by Baltimore Marine Industries (BMI), a full-service (ship construction and ship repair) shipyard located at Sparrows Point, Maryland. Since I had a degree in Marine Engineering with specialization in Shipyard Engineering Management, I was placed immediately into the shipyard's management training program. Referred to as a "Loop Training Program," I spent approximately half a year working in nearly every shipyard production shop and engineering support group. With my diverse training background in all aspects of shipyard production, I quickly became a Junior Ship Superintendent and later a Ship Superintendent, responsible for managing all aspects of a ship overhaul and repair contract. Since Baltimore Marine Industries was a full-service shipyard, I gained valuable experience in ship construction, ship repair, ship conversion, fabrication of industrial products, and ship recycling.

7. During new construction I helped manage the construction planning, material ordering and engineering for the construction of four new double-hull oil barges. Later, I moved to the production department where I supervised shipfitters, burners, chippers, and welders who were constructing and welding barge units. Work under my supervision was inspected by regulatory bodies (U.S. Coast Guard and American Bureau of Shipping (ABS)) inspectors and required my coordination. I gained valuable experience in constructing, scheduling, and ship construction sequencing.

8. I managed the repair of approximately 100 ships during my employment. Ships repaired included U.S. Navy ships, merchant ships both (U.S. and foreign owned) as well as

merchant type ships owned by the U.S. Navy Military Sealift Command (MSC) and Maritime Administration (MARAD). During ship repair contracts, I learned the intricate details associated with drydocking, repairing, and overhauling a diversity of ship types. I also coordinated with port engineers, owner's representatives, and U.S. Navy surveyors (Supervisor of Shipbuilding, Conversion, and Repair (SUPSHIP)) daily. Finally, I negotiated change orders, credits, and work packages with owner's representatives.

9.     I also managed the activation of several Maritime Administration cargo ships in various levels of readiness, which were mothballed in the National Defense Reserve Fleet (NDRF). These ships were all under dehumidification to preserve machinery, piping, and steel structures. Since I am a Licensed Third Assistant Engineer, I supervised the "activation crew" which included machinists, pipefitters, and electricians. The activation crew assembled and tested piping systems and valves which were opened and drained during deactivation. Additionally, machinery and equipment, including boilers, turbines, pumps, distillers, generators, air compressors, refrigeration and air conditioning compressors, and sewage treatment systems were assembled, tested, and put back into operational condition. Once shipboard systems were operational and tested during dock trials, the ship was required to leave the pier and perform a 24-hour sea trial to prove that the mechanical systems were operating properly. Upon successful completion, I supervised the deactivation team, who disassembled the piping, machinery and equipment so that the vessel could be deactivated and returned to the National Defense Reserve Fleet.

10.     I was involved in the initial stages of managing the Naval Shipbreaking Program and have overseen the successful scrapping of nine former U.S. Navy vessels built during the 1950s. To safely scrap these vessels, I needed to have an intimate knowledge of shipbuilding material. This included identifying and abating all toxic materials on board these vessels, mainly asbestos, lead, and polychlorinated biphenyls (PCB's), before the scrapping could commence. I gained valuable experience with and knowledge of OSHA rules, regulations, and laws governing work with and around potentially hazardous materials. I also coordinated with industrial hygienists, safety professionals and personnel who were removing friable and non-friable asbestos-containing materials to ensure that abatement was being done in accordance with

5

DECLARATION OF CHRISTOPHER P. HERFEL

applicable rules, regulations, and policies.

11. I also worked as production manager for the Joint Modular Lighterage System (JMLS) demonstration program, the precursor to the Improved Navy Lighterage System (INLS) currently used by the Navy and Army to move equipment and supplies from ship to ship and from ship to shore. Most (75 percent) of this $20 million government contract was fulfilled at the Baltimore Marine Industries facility. I gained valuable knowledge and experience working with Department of Defense contracting personnel during this multi-year- long contract.

12. Through my education, training and work experience, I have developed expertise regarding U.S. Navy ship design, development, maintenance, construction and repair, including U.S. Navy and Military specifications; the level of control and supervision exercised by the U.S. Navy over the design, manufacture and installation of equipment and machinery aboard a U.S. Navy vessel; the use of asbestos on U.S. Navy ships and in shipyards; and publications by the United States government and the Navy concerning asbestos hazards. My experience has involved performing many years of research on these issues, and I have researched and reviewed documents at several National Archives and Records Administration facilities and other libraries and document repositories.

13. That I have read the Complaint filed by the Plaintiffs, DENNIS HALE and LORA HALE, and am informed accordingly that Plaintiffs have alleged that during the course of DENNIS HALE's service in the United States Navy from 1960-1983, he was exposed to and inhaled asbestos fibers emanating from certain products he was working with and around, including products which were manufactured, sold, distributed or installed by the Defendant Crosby Valve, LLC, hereinafter Crosby Valve.

14. Crosby Valve did manufacture and supply some boiler safety valves installed on board some but not all U.S. Navy ships.

15. Boiler safety valves approved for use on board U.S. Navy ships must strictly comply with reasonably precise specifications in the form of Military Specifications and/or the military approval process. The only specification applicable to boiler safety valves approved for use on board the U.S. Navy ships on which Mr. Hale served were constructed in accordance with

Military Specification MIL-V-17462.

16.     Numerous Military, Federal, and Commercial Specifications, Standards, and Drawings are incorporated by reference into Military Specification MIL-V-17462. Adherence to these specifications is part of the contractual obligations between the contractor and the U.S. Navy. Accordingly, all materials used in ship procurement are subject to a thorough review by the U.S. Navy and specifically approved for use by the U.S. Navy.

17.     Before a manufacturer such as Crosby Valve received authorization to manufacturer or supply machinery, such as boiler safety valves, for/to the U.S. Navy, all of the drawings, plans, technical manuals and other design documentation first had to be inspected and approved by the U.S. Navy. To the extent that any piece of equipment supplied by Crosby Valve contained or incorporated asbestos, it would have been specifically required or approved by the Navy through Military Specifications and/or the design approval process.

18.     U.S. Military inspectors and engineers frequently reside at a manufacturer's plant to personally oversee, inspect, and approve the work performed by the manufacturer. The inspectors were empowered to observe the manufacturing process, test component parts and the finished assembly, accept qualified units or reject any defective units. If, at any point, any material, feature or component failed to comply with the applicable U.S. Military Specifications or performance requirements, then it was rejected by the inspectors on behalf of their military service. The on-site inspectors had detailed prints and drawings of every part used in the manufacturing and construction. It should be noted that acceptance by the U.S. Navy of the material shows that it was manufactured in complete conformance with the applicable specification.

19.     The selection of thermal insulation material used aboard Navy ships was delegated by the Navy to the overall ship designer and/or the shipyard which built or repaired the ship. Installation of thermal insulation products was done by the shipyard which built or repaired the ship. Both ship designers and shipyards were required to make their selections in accordance with Navy specifications and Military Standards and their selection and installation of thermal insulation materials was subject to review and approval by the Navy in similar fashion to the specification, review and approval process for machinery. Therefore, if any thermal insulation

DECLARATION OF CHRISTOPHER P. HERFEL

material, whether or not asbestos-containing, was used in conjunction with any equipment manufactured and/or supplied by Crosby Valve for use on a U.S. Naval vessel, then use of that insulation was specifically reviewed and approved by the Navy as being in compliance with applicable Navy standards and Military Specifications.

20.    If a boiler safety valve manufactured by Crosby Valve was actually installed on board any of the U.S. ships on which Mr. Hale served, then that valve, and the material composition of the valve components complied with precise specifications, standards, and design requirements that the Navy required for such a component. If such a component contained asbestos, then the Navy required and approved the inclusion of asbestos in that component in one form or another.

21.    In 1943 the U.S. Navy, which at that time included the U.S. Coast Guard, and the U.S. Maritime Commission, predecessor to the U.S. Maritime Administration, published Minimum Requirements for Industrial Safety and Health in Contract Shipyards. Among the industrial diseases specifically identified in this publication was Asbestosis. General recommendations were also provided of methods to prevent shipyard workers from contracting this disease. Before publishing this document and distributing it to every shipyard in the United States, Philip Drinker, Ph. D., the Chief Health Consultant to the U.S. Maritime Commission's Division of Shipyard Labor Relations, along with a team to assist him, toured every major shipyard on the East Coast, Gulf Coast, West Coast and Great Lakes to see how asbestos-containing insulation and lagging were handled and installed. After each visit, he left behind specific instructions to the shipyard on how to improve their protection of its employees with regards to asbestos dust.

22.    The health effects of asbestos dust on shipyard workers was studied during World War II by Dr. Drinker and his team several times. Asbestos-related studies were also conducted by the U.S. Navy, state health departments, and shipyard medical / industrial hygiene personnel. The ultimate result of these studies, all of which took place aboard ships being constructed for the U.S. Navy, was A Health Survey of Pipe Covering Operations in Constructing Naval Vessels, better known as the Fleisher-Drinker Report. In subsequent years, U.S. Navy industrial hygienists and other medical personnel assigned to Naval Shipyards studied asbestos dust creation and its

DECLARATION OF CHRISTOPHER P. HERFEL

effects on shipyard workers. The Fleisher- Drinker report was the peer reviewed scientific standard on shipyard asbestos diseases until other studies were published in the mid-1960s, including those of William T. Marr (Long Beach Naval Shipyard) and Carl A. Mangold / Daniel J. Bessemer (Puget Sound Naval Shipyard).

23.     The U.S. Government, through the Armed Forces and other entities, was and remains, one of the world's largest heavy industrial concerns. Every day for over 100 years, thermal insulation materials, gaskets, and packing have been removed, fabricated, and installed by shipyards and ship repair facilities owned by the United States. In the early 1940s, the U.S. Navy's Bureau of Medicine and Surgery initiated its own industrial hygiene program to provide greater protection for its uniformed and civilian workforce from the effects of chronic exposure to asbestos. The U. S. Navy's Bureau of Medicine and Surgery has continued and expanded its Industrial Hygiene mission through the present day. As a result of these programs from the 1940s up to the present day, the United States Government as a whole, including the U.S. Navy, developed and acquired state-of-the-art knowledge concerning potential risks or hazards relating to work with or around a multitude of products and materials, including those which contained asbestos. It is inconceivable that a component manufacturer, such as Crosby Valve, would have had the same level of sophisticated knowledge as the U.S. Navy concerning potential asbestos hazards. In fact, the United States Government, including the U.S. Navy, specifically possessed information and knowledge superior to that of its contractors on issues of asbestos-related industrial hygiene associated with the use of asbestos-containing components or materials in naval and merchant marine vessels.

24.     The "Occupational Health Hazards" bulletins in **Exhibit 2** demonstrate that as of 1958, the Navy identified inhalation of "asbestos dust" as a potential occupational health hazard. See "Occupational Health Hazards: Release No. 18" (for periods July-September 1958), p. 97, in **Exhibit 2**. The bulletins further chronical the Navy's efforts to collect data for evaluating the potential exposure of its personnel and develop workplace controls to minimize the potential for exposure to asbestos dust. For example, **Exhibit 2** states:

a.     "We are attempting to maintain a continuous health educational program for our

9

DECLARATION OF CHRISTOPHER P. HERFEL

asbestos workers. The shop has been most cooperative in this effort. The file, "The Air We Breath" [sic], was obtained from MSA and shown on four occasions to small groups of these employees. This educational movie was followed by a short discussion of the hazards of breathing asbestos fibers and the use of dust respirators Release No. 22 (for periods July-September 1959), p. 179

b.   "In general, it is concluded that while cutting and installing insulation block and when ripping out old insulation, the dust counts usually exceed the safe concentration, assuming all the dust to be asbestos. When installing asbestos cloth and prefabricated insulation, the dust counts generally are within acceptable limits. It has been recommended that pipe coverers and insulators performing dusty jobs be required to wear dust respirators. In some cases, it may be feasible to wet down the insulating material before the work is begun, to reduce dust formation." Release No. 27 (for periods October-December 1960), p. 88

c.   "1. Asbestos Dust. Survey was completed of pipe covering and insulation section. The survey included layout and cutting, molding operations, and sewing of boots and jackets. The layout and cutting are the dustiest operations in the shop. During the handling and unrolling of the asbestos, considerable dust is generated, but appears to settle rapidly. During the layout and cutting, a fine water spray is used for wetting down. Once the asbestos is wetted, the cutting causes very little dust. In addition to this control, ventilation is proved for the operation. Total dust count after wetting and cutting was 2. million particles/cubic foot.

2. Asbestosis. In 1958, a study was begun on pipecoverers (asbestos) working conditions. Chest x-rays and vital capacity test were conducted on asbestos workers. At that time, we had one former employee receiving compensation for asbestosis. According to NCPI 792, pipecoverers are to receive a chest x-ray annually. At LBNS it was decided to give these employees a chest x-ray every six months…" Release No. 29 (for periods April-June 1961), p. 32

d.   "1. Asbestos - A study was conducted to obtain current data for evaluating

10

DECLARATION OF CHRISTOPHER P. HERFEL

the exposure of pipecovers [sic] to asbestos containing dust. Some average dust counts of samples taken in the pipecoverer's shop during routine work procedures and aboard ship during the removal of amosite from boilers were as follows… Dust concentrations found in the general atmosphere of the shop were within permissible levels at the time of sampling… The excessive dust counts obtained aboard ship, emphasized the need for the wearing of approved dust respirators by pipecovers [sic]." Release No. 33 (for periods April-June 1962), p. 29.

25.     The U.S. government, through its different branches of the Armed Forces, was and remains one of the world's largest heavy industrial concerns. Every day for over 100 years, thermal insulation materials, gaskets, and packing have been removed, fabricated, and installed by government owned and operated shipyards, ship repair facilities, and shipbuilding contractors. Due to the U.S. Navy's sophisticated occupational health and industrial hygiene programs, the military services as a whole developed and acquired state of the art knowledge concerning potential risks or hazards relating to work with or around asbestos-containing materials and products. The U.S. Navy possessed information and knowledge superior to that of companies manufacturing shipboard products on issues of asbestos-related industrial hygiene. This specifically included any potential risks associated with the use of asbestos-containing components or materials on or in safety and relief valves.

26.     I have read the foregoing and all of the information contained therein is true and accurate to the best of my personal knowledge.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on *February 8, 2022* at Baltimore, Maryland.

Christopher P. Herfel

11

# EXHIBIT 1

# McCaffery & Associates, Inc.
## Historical Research

**CHRISTOPHER P. HERFEL**

**EDUCATION, TRAINING, LICENSES, AND PROFESSIONAL AFFILIATIONS**

MBA, Loyola College of Maryland, Management & Finance, 2004

B.S., Marine Engineering, Minor in Engineering Management, United States Merchant Marine Academy, 1998

Third Assistant Engineer License, Steam & Diesel Propulsion, Unlimited Horsepower, U.S. Coast Guard

Trained Shipyard Competent Person, Confined Space & Marine Chemist Certification as defined in 29CFR1915.7(b)

Trained Welder, Electrode & MIG Procedures

Lieutenant, United States Naval Reserve

Member, Society of Naval and Marine Engineers (SNAME)

Member, American Society of Naval Engineers (ASNE)

**UNIQUE OR SPECIAL QUALIFICATIONS**

Mr. Herfel serves as Chief Executive Officer (CEO) of McCaffery & Associates, Inc., a maritime and naval consulting firm that specializes in the research and analysis of U.S. Navy, Coast Guard and other federal government agency documents, records, plans, photographs and publications regarding ship design, construction, maintenance, repair and conversion. In addition, the firm also provides research and analysis of similar records and documents regarding naval and merchant marine personnel training, government contracting and purchasing, personnel safety and health, use of asbestos on naval ships, government specifications for the use of asbestos on naval ships and knowledge of the federal government and Navy concerning the hazards of asbestos and other known toxic materials. A key client liaison, Mr. Herfel determines the most cost effective, efficient, and timely means of meeting the research project needs. He directs the research team to locate and analyze historical correspondence documents.

Depending on case specifics, correspondence between the Navy, Maritime Commission, shipyards, design agents, and manufacturers is analyzed. After retrieving all the relevant documents, a historical timeline of any Navy, merchant, or Coast Guard vessel is developed by Mr. Herfel. At that point, a ship's history is developed from initial design through shipyard construction, following the vessel while in service and ending with the final disposition of the vessel. Additionally, he has extensive knowledge regarding the historical use of asbestos in the Navy and Department of Defense, knowledge of the hazards through the decades, and the implementation of asbestos-related safety and industrial health standards, protocols, et cetera, from the 1930s through the 1980s.

Mr. Herfel combines his past experiences in shipyard operations, ship design, marine engineering, naval policies, and employment working on U.S. Navy and merchant vessels to analyze and interpret detailed correspondence, blueprints, specifications, and contracts. Mr. Herfel has participated in the new construction of oil barges and the conversion, overhaul, and repair of more than a hundred merchant and naval vessels. Ships repaired included U.S. Navy ships, merchant ships (both U.S. and foreign owned) as well as U.S. Government owned ships operated by the U.S. Navy Military Sealift Command (MSC) and Maritime Administration (MARAD). While executing ship

repair contracts, he learned the intricate details associated with drydocking, repairing, and overhauling diverse types of ships.  He also coordinated with port engineers, owner's representatives, and U.S. Navy surveyors (Supervisor of Shipbuilding, Conversion, and Repair (SUPSHIP)) daily.  Finally, he negotiated change orders, credits, and work packages with owner's representatives.

Mr. Herfel was involved in the initial stages of managing the Naval Shipbreaking Program and has overseen the successful scrapping of nine former U.S. Navy vessels built during the 1950s and 1960s.  To safely scrap these vessels, he needed to have an intimate knowledge of shipbuilding material.  This included identifying and abating all toxic materials on board these vessels, mainly asbestos, lead, and polychlorinated biphenyls (PCB's), before the scrapping could commence.  He gained valuable experience with and knowledge of OSHA rules, regulations, and laws associated with working with and around potentially hazardous materials.  He also coordinated with industrial hygienists, safety professionals and personnel who were removing friable and non-friable asbestos-containing materials to ensure abatement was being done in accordance with applicable rules, regulations, and policies.  His knowledge of the environmental impact of ship construction, repair and scrapping have been used in cases involving groundwater and soil contamination.

**WORK HISTORY**

**McCaffery and Associates, Inc.**                               **September 2003 to present**

**Current Position Title:** Chief Executive Officer (CEO)

Mr. Herfel manages and works with a team of current and former naval and maritime officers who research naval and commercial ship design, construction, maintenance and repair records in support of asbestos and toxic tort litigation.  The majority of the work is conducted at the National Archives or other libraries in the Washington, DC, metropolitan area.  Research is done on original correspondence files, microfilm, and original ship plans.

Through his education, training and work experience, he has developed an expertise regarding U.S. Government and commercial ship design, development, maintenance, construction and repair, including applicable ship building specifications; the level of control and supervision exercised by the United States Government over the design, manufacture and installation of equipment and machinery aboard  United States Navy and merchant ships; the use of asbestos on United States Navy and commercial ships and in shipyards; and publications by the United States government and the Navy concerning asbestos hazards. This experience has enabled him to perform detailed research and analysis of historical documents on these issues.

**MWI Services, Inc.**                                    **July 2003 to September 2003**

Mr. Herfel worked with a team of current and former naval and maritime officers who researched naval and commercial ship design, construction, maintenance and repair records in support of asbestos and toxic tort litigation.  The majority of the work was conducted at the National Archives and other archival libraries in the Washington, DC, metropolitan area.

**Baltimore Marine Industries**                                    **July 1998 to July 2003**

**Position Titles:**   Project Manager, Ship Disposal Program (Final Position)
Project Manager, Ship Repair and Construction
Ship Superintendent, Ship Repair
Production Manager, Joint Modular Lighterage System
Welding and Fabrication Supervisor, Ship Repair
Machinery Supervisor, Ship Repair
Project Planner/Scheduler, Critical Path Methodology

During Mr. Herfel's time at Baltimore Marine Industries he was involved with the new construction of barges and industrial products, the repair and conversion of commercial vessels, and the scrapping of former U.S. Navy vessels.  Mr. Herfel held many positions of increasing responsibility in the ship repair and construction field. Having shipboard engineering experience, Mr. Herfel also frequently participated in the operation and troubleshooting of shipboard mechanical components. Mr. Herfel successfully activated the engine room of several "Ready Reserve" vessels that were laid up in the James River Reserve Fleet.

Mr. Herfel also served as production manager for the Joint Modular Lighterage System (JMLS) demonstration program, the precursor to the Improved Navy Lighterage System (INLS) currently used by the Navy and Army to move equipment and supplies from ship to ship and from ship to shore.  Most (75 percent) of this $20 million government contract was fulfilled at the Baltimore Marine Industries facility.

Mr. Herfel developed an intimate knowledge of shipbuilding materials and techniques used on many vessels while working for Baltimore Marine Industries.  Mr. Herfel's last position served was as project manager responsible for the abatement, remediation, and scrapping of nine former U.S. Navy vessels.

**U.S. Naval Reserve**                                              **1998 to 2006**

**Position Title:** Lieutenant (Final Rank)

After graduating from the Merchant Marine Academy, Mr. Herfel served as an Officer in the United States Naval Reserve for eight years, obtaining the rank of Lieutenant.  He was designated as a Marine Engineer (1675 designator) and was assigned to the United States Naval Reserve, Merchant Marine Ready Reserve (USNR MMR).  During his Naval Reserve career, he gained valuable experience and expertise in maintenance, upkeep, activation, and deactivation of U.S. Navy and merchant ships located in Ready Reserve Fleet.  Mr. Herfel also gained valuable first hand experience with the Navy/Federal Supply System.  Additionally, while assigned to Active Duty Training, he successfully completed the National Sealift Training Program for Engineers training course.  During this training, students received advanced training about shipboard systems and typical problems that occur while activating and maintaining Reserve Operating Status (ROS) 4 and ROS 5 ships as well as Ready Reserve Fleet (RRF) 10, 20 and 30 ships.   During Active Duty Training, he also successfully completed several U.S. Navy correspondence training courses which focused on ship maintenance and repairs, marine engineering economics, and management of time and cost in shipbuilding projects.

**U.S. Merchant Marine Academy**                                      **1994 to 1998**

**Position Title:** Midshipman/Cadet

The United States Merchant Marine Academy is a federal service academy known for its rigorous academic program.  USMMA required more credit hours for a baccalaureate degree than any other federal service academy.  This course load is supplemented by "Sea Year."  While a Midshipman at the U.S. Merchant Marine Academy at Kings Point, Mr. Herfel sailed during his Sea Year on various commercial and former U.S. Navy vessels, outfitted with both steam and diesel propulsion plants.  As an engineering cadet, Mr. Herfel participated in the daily maintenance and operation of the engineering plants of these ships.  Mr. Herfel worked with superheated boilers of 1,200 psi, diesel engines of 35,000 shaft horsepower, turbines, generators, purifiers, compressors and other critical shipboard components.

Mr. Herfel graduated from the United States Merchant Marine Academy in 1998 with a Bachelor of Science degree in Marine Engineering with a minor certificate in Shipyard Engineering Management.  This major required Mr. Herfel to take many specialized marine and naval courses, including courses that specialized in: marine engineering, marine steam, diesel, and gas turbine plants, electrical engineering, marine refrigeration, material sciences, welding, other specialized classes.  For his minor, he was required to take a unique subset of academic courses that focused specifically on the ship construction and ship repair industry, including classes in advanced naval architecture, process and workflow operations, marine economics, critical path methodology scheduling, ship construction and repair techniques, and advanced welding and metallurgy theory.  A year long capstone project was also required for his minor certificate, during which he recreated the shipyard overhaul and repair availability of a U.S. Navy ship from preliminary planning  through sea trials.  Mr. Herfel incorporated real-life experiences into this project that he gained during a six-week-long internship, where he participated in the overhaul of USS Supply (AOE 6).

Updated 7/17/2019

# EXHIBIT 2

UNCLASSIFIED MAIL CONTROL
BUMED 5216/8 (REV.  6-70)

SERIAL: 43530

FROM CODE: 73

DATE: 18 Jan 1974

| IDENTIFICATION | ORIGINATOR'S IDENTIFICATION DATA | DATE OF LETTER | DATE RECEIVED | REPLY DUE |
|---|---|---|---|---|
| | NAME OF INDIVIDUAL *(When applicable)* | | SUBJECT IDENTIFICATION CODE | |

SUBJECT

Report of Occupational Health Services Narrative Release No. 71

INSTRUCTIONS

1. Each correspondence control desk shall detach a copy of this form and use it as its control log.  On the log copy, indicate internal routing of correspondence.  Remove extra carbons as copies are pulled.
2. When submitting correspondence to Codes 1 and 2 for signature, submit at least the original and one copy of this form.
3. See BUMEDINST 5216.10 series for detailed procedures.

**ROUTING AND CLEARANCE**

ROUTING        *SYMBOLS: A-Action, CL-Clearance, C-Comment, I-Information, R-Retain, SC-Separate Copy, S-Signature

| TO CODE | FOR * | CONTROL DESK IN | CONTROL DESK OUT | COMMENTS BY CLEARANCE CODES If more space is needed, use memo and indicate below "Memo attached." | DATE | INITIAL |
|---|---|---|---|---|---|---|
| 442 | | | | | | |
| 2133 | | | | | 1/24 | Kew |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| ASSISTANT CHIEF Code | 7 | S | 1/24/74 | | 1/23 POW | |
| DEPUTY CHIEF | | | | | | |
| CHIEF OF BUREAU | | | | | | |

**FOR SIGNATURE MAIL**

PREPARED BY *(Organization Title and Code)*
LTJG E. A. Macy's, General Industrial Hygiene Section, BUMED Code 7321

TELEPHONE EXTENSION
44620

BRIEF ALL CORRESPONDENCE FOR SIGNATURE BY THE CHIEF OR DEPUTY (SUPPLY SIGNIFICANT DATA, OMIT MINOR DETAILS)

The report of Occupational Health Services Narrative Release is published semi-annually.  The release is derived from reports submitted by the Navy industrial hygienists located at the Regional Medical Centers.

Very respectfully,

SIGNATURE *(Division Director)*
GEORGE M. LAWTON, CAPT MC USN

DATE
18 Jan 1974

**UH-UL USE**

| RECEIVED | RETURNED | SALUTATION: |
|---|---|---|
| DISPOSITION | | COMMENTS: |
| SIGNED | PICKED UP | |
| MAILED | OTHER | |

*Previous issues of this form and BUMED 5216/8 and BUMED 45-12 are obsolete.*

A-27280

BUMED-7321:DAM:phc
23 Jan 1974

From:   Chief, Bureau of Medicine and Surgery
To:     Activities Submitting Report of Occupational
        Health Services

Subj:   Report of Occupational Health Services Narrative
        Release No. 71

Ref:    (a) BUMEDINST 6260.7B

Encl:   (1) Report of Occupational Health Services Narrative
            Release No. 71

1.  The Reports of Occupational Health Services (MED 6260-1) for the
period 1 January through 30 June 1973 have been reviewed by the
Industrial Environmental Health Division (Code 73).  Items having
wide interest or application have been selected from the narrative
portions of the reports and are forwarded herewith as enclosure (1).

2.  The compilation of occupational health hazards, environmental
pollution problems and related items contained in enclosure (1) is
intended to assist Medical Department personnel in the recognition
of potentially hazardous materials and processes.  Solutions to
current problems are described.  Further information regarding
specific hazards described in enclosure (1) may be obtained by
writing the originating activity.


                        P. O. GEIB
                        Assistant Chief for Research &
                        Military Medical Specialties




                    BUMED CENTRAL FILES

Report of Occupational Health Services
Narrative
Derived from Semi-annual Occupational Health Reports
(MED 6260-1)
1 January 1973 -- 30 June 1973

Release No. 71                                    For Official Use Only

## I.  OCCUPATIONAL MEDICINE

1.  Anti-fouling Paint Application Problems.  One day following the
airless spray application of an organo-tin anti-fouling paint (Formula
1020A) to a submarine and during its undocking, fifteen employees
working on the undocking procedure presented with varying degrees of
cough, burning, midline chest pain and pharyngeal irritation.  Other
than some slight injection and erythema of the post pharynx, physical
findings were normal.  Under conservative management all symptoms
cleared within 24 hours.

Observations at the work site indicated the airless spray
application had been associated with considerable overspray.  Further,
ambient temperature during application reached 105° F, resulting in
rapid volatilization of the thinner (MIBK).  It was concluded the latter
fact led to significant quantities of paint powdering before being
applied to the ship's surface.  On the following day during the undock-
ing, a brisk breeze arose and this powder became airborne, reaching the
breathing zone of the workers.

At the first presentation of symptoms, work was stopped and the
ship washed down to remove any loose, powdered paint.  No further com-
plaints were received during the remainder of the undocking.

This incident constitutes the second time this Shipyard has
experienced multiple cases of mild upper respiratory tract symptoms
following incidental exposure to airborne organo-tin paint not asso-
ciated with its application.  This should only tend to underline the
precautions necessary when dealing with these compounds.        MINSY

2.  Occupational Asbestos Exposure.  Prior to receipt of BUMED
Instruction 6260.14, "Asbestos; measures for control of", a letter was
sent to Southern Division, Naval Facilities Engineering Command that
explained the health hazard from exposure to asbestos.  It was mentioned
that Resident Officer in Charge of Construction (ROICC) personnel and
others, whose on-site construction inspection work may, at times,
subject them to hazardous concentrations of airborne asbestos dust from
rip-out or installation of asbestos materials, should be administra-
tively considered as "asbestos workers".  Recommendations were made that
these personnel receive medical examinations for occupational exposure

Air samples were also collected during sandblasting of a
submarine hull painted with Formula 1020A paint.  The sandblast nozzle
was fitted with a water-ring adapter in order to minimize dust
concentrations.  Organo-tin concentrations at the sandblaster's
breathing zone were found to range from 0.06 to 0.21 milligrams per
cubic meter of air.  General air concentrations on a gangway and at
the top of the drydock were found to range from 0 to 0.4 milligrams
per cubic meter.

MINSY

2.  **Asbestos and Ship's Force.**  During routine monitoring of
pipecoverers and insulators performing ripout of asbestos insulation in
posted engineering spaces, it has been observed that ship's personnel
frequently ignore the warning signs and move through the restricted
areas.  Ship's personnel have also been observed removing asbestos
insulation without using respiratory protection and using air hoses
to blow down spaces contaminated with insulation dust.  An increased
effort is being made to indoctrinate the shipboard personnel
regarding the dangers of exposure to asbestos dust.

LBNSY

3.  **Asbestos Dust Generation Control.**  During ripout of
asbestos containing materials aboard ships, this shipyard utilizes a
water spray from portable spray cans to reduce dust production.  The
asbestos materials are dry and brittle and are difficult to wet
thoroughly.  It has been found that the addition of a small amount of
wetting agent to the spray water aids in suppressing airborne dust
concentrations to below the threshold limit value for asbestos fibers.

HPNSY

4.  **Asbestos in Formica.**  Asbestos fiber concentrations at
operator breathing level were measured during sawing, grinding, sanding
and routing of decorative formica-asbestos laminated panels (MIL-T-
17171B, Type IV).  Asbestos concentrations during sawing with a carbide
tip blade ranged from 0.4 to 13.6 fibers/cc.  Grinding and routing
produced concentrations of 14.1 to 17.1 fibers/cc and 7.1 fibers/cc,
respectively.  Recommendations were made for exhaust ventilation
control of all equipment; the use of personal protective equipment and
medical surveillance of exposed personnel, or, preferably, substitution
with asbestos-free material.

MINSY

5.  **Asbestos in Storage and the Supply Department.**  Two
Shipyard supply storage sheds were visited in order to determine the
types of asbestos insulation materials still in storage.  It was
found that a quantity of high asbestos-containing thermobestos pipe
insulation, amosite felt and insulation cements were still on hand.

5

Subsequently, Planning Department personnel were contacted and after a return visit to these areas with their representatives, an accelerated disposal schedule was instituted. In the interim, Supply Department personnel were advised to wear proper protective equipment during handling of asbestos-containing materials. Recommendations were also made for cleaning up spilled material, including the use of vacuuming, and for posting the area and labelling of all asbestos material containers.

                                                                                    MINSY

6. **Asbestos Ripout.** In response to a request by the Boiler Shop, a survey was performed aboard a destroyer to determine the airborne asbestos concentration during ripout of the insulation inside a firebox. A lapel mounted Millipore filter was used to collect the samples. During the ripout work, asbestos fiber concentrations in all areas in the lower level of the boiler room exceeded the TLV of 5 fibers/ml greater than 5 microns in length. Proper respiratory protection and the posting of the area were recommended.           CNSY

7. **Blueprint Copiers.** Two Bruning blueprint copiers were studied for emission of ammonia vapor. Airborne concentrations of ammonia ranged from 10 to 37 ppm at the operators' breathing zones during operation of the machines. Airborne concentrations measured 4 inches above the prints one minute after removal from the machines ranged from 175 to 250 ppm. No leaks were found in the ductwork of the exhaust system downstream from the fan and fan capacity measured in the exhaust duct was satisfactory. Recommendation was made to install a mechanical exhaust ventilated hood over the tables receiving the fresh prints from the machines, the hoods to be enclosed at the rear, ends, and top.                                        NAD Crane

8. **Brazing Hazards.** Two pipefitters were assigned to work with a brazer in a ship's tank. They were engaged in fitting up a five-inch pipe for brazing. The brazer was wearing an airline respirator and had a small airline (3/4 inch) blowing air into the tank. The employees had entered the tank at approximately 1400 hours. The brazer used a Grade 3 silver solder (cadmium free) and his torch was allowed to burn for almost 40-45 minutes. During this period, very little smoke was given off during the brazing. The two pipefitters left the tank at approximately 1515 hours to get some fresh air. Shortly thereafter, one of the employees reported some dizziness and shortness of breath, and the other developed a severe cough. Both employees reported to the Naval Hospital for treatment and were later released to return home.

Oxides of nitrogen are the primary products of brazing torch flames and inhalation can cause severe respiratory difficulties and possibly disabling work injuries.

In order to avoid possible serious injury to personnel in the future, it was recommended that all brazing be performed with strict adherence to the health requirements outlined in local directives.

6

Release No. 71                                              For Official Use Only

## Industrial Environmental Health Division
## Bureau of Medicine and Surgery

| Office | Name | BUMED Code |
|---|---|---|
| Director | CAPT G. M. Lawton MC | 73 |
| Administrative Assistant | LT R. H. Hazelton MSC | 73A |
| Occupational Medicine Branch | CDR E. J. Sullivan MC | 731 |
| Hearing & Sight Conservation Section | LCDR J. J. Drozd MSC | 7311 |
| Thermal Stress Section | LCDR A. Dasler MSC | 7312 |
| Industrial Environmental Control Branch | LCDR D. E. Rector MSC | 732 |
| Industrial Hygiene Section | LTJG D. A. Macys MSC | 7321 |
| Pollution Abatement Section | LCDR L. E. Doptis MSC | 7322 |
| Safety Branch | Mr. L. M. Kempf GS-14 | 733 |

The direct autovon number for the Industrial Environmental Health Division
is 294-4620, Commercial (202) 254-4620.

The items in this Release are abstracted from semiannual Reports of Occupa-
tional Health Services by naval field activities.  Items in this Release
are for informational purposes only and are not to be construed as official
policy of the Bureau of Medicine and Surgery or of the primary support
Bureau of the reporting activity.  Name of the senior civil service indus-
trial hygiene officers and their locations are listed as an aid to readers
who desire additional detail from the authors of abstracted items.

### Civil Service Senior Industrial Hygienists

| | | |
|---|---|---|
| Naval Shipyard, Boston | BNSY | E. D. Storlazzi |
| Naval Shipyard, Bremerton | PSNSY | R. R. Beckett |
| Naval Regional Medical Center, Charleston | NRMCC | G. Siebert |
| Naval Shipyard, Long Beach | LBNSY | Sheldon Manning |
| Naval Shipyard, Mare Island | MINSY | G. J. Rosati |
| Naval Shipyard, Hunters Point | HPNSY | J. G. Psathas |
| Naval Shipyard, Norfolk | NNSY | William T. Marr |
| Naval Shipyard, Pearl Harbor | PHNSY | F. Hertlein |
| Naval Shipyard, Portsmouth, N. H. | PoNSY | A. V. Munton |
| Naval Shipyard, Philadelphia | PNSY | J. Lieberman |
| Naval Safety Center, Norfolk | NSC | |
| Naval Air Station, Alameda | NASA | Oscar Sobol |
| Naval Air Station, Jacksonville | NASJ | R. E. Byrd |
| Naval Air Station, Norfolk | NASN | Sal DiLustro |
| Naval Aerospace & Regional Medical Center, Pensacola | NARMC | P. A. Malone |
| Naval Air Station, Point Mugu | NASPM | Sam Lager |
| Naval Air Station, San Diego | NASSD | Miguel Padilla |
| Naval Weapons Center, China Lake | NWC | P. R. Cuykendall |
| Naval Toxicology Unit, NNMC, Bethesda | NTU | Robert A. Jones |
| Naval Research Laboratory, Washington | NRL | |
| Naval Ordnance Station, Indian Head | NOS | Edward Borawski |
| Naval Ammunition Depot, Crane | NAD | John J. Fitch |
| Navy Industrial Environmental Health Center, Cincinnati | NIEHC | Arthur E. Johnston |
| Naval Regional Medical Center, Long Beach | NRMCLB | Robert Manning |

29

<u>Release No. 71</u>                                    <u>For Official Use Only</u>

Medical Service Corps Industrial Hygiene Officers

Regional Medical Center, Norfolk                          NRMC NORFOLK
    CDR S. H. Barboo, Jr., MSC, USN

Environmental and Preventive Medicine Unit #2, Norfolk    EPMU #2
    LTJG R. J. Hershman, MSC, USNR
    LTJG L. S. Betts, MSC, USNR

Environmental and Preventive Medicine Unit #5, San Diego  EPMU #5
    LTJG R. E. Pavlik, MSC, USNR

Environmental and Preventive Medicine Unit #6, Pearl Harbor  EPMU #6
    LT R. L. Johnson, MSC, USN

Environmental and Preventive Medicine Unit #7, Naples     EPMU #7
    LT C. W. Baker, MSC, USN

Industrial Environmental Health Center, Cincinnati        NIEHC
    LTJG L. R. Liukonen, MSC, USNR
    LTJG M. T. Nilan, Jr., MSC, USNR
    LTJG M. D. Densley, MSC, USNR

Armed Forces Radiobiology Research Institute, Bethesda, Md.  AFRRI
    LT A. A. Stefanyshyn, MSC, USN

30

INDEX TO OCCUPATIONAL HEALTH HAZARDS

Release No. 71

Air Agitation in Chrome Plating  p. 13, item D-1
Aircraft Paint Stripping Facility Ventilation  p. 18, item D-18
Ammonia Vapors from Ozalid Machine  p. 16, item D-11
Anti-Foulant Paint
  -Application and Removal  p. 4, item C-1
  -Application Problems  p. 1, item I-1
Argon Interference with Hydrogen Testing  p. 13, item D-2
Asbestos
  -Dust Generation Control  p. 5, item C-3
  -Exposure of Ship's Force  p. 5, item C-2
  -Formica containing  p. 5, item C-4
  -Occupational Exposure to  p. 1, item I-2
  -Ripout in Firebox  p. 6, item C-6
  -Storage and Handling  p. 6, item C-5
  -Ventilation during Ripout  p. 14, item D-4
  -Weld Stress Relief, use in  p. 13, item D-3


Blueprint Copiers  p. 6, item C-7
Brazing Hazards  p. 6, item C-8
Breathing Air
  -Analysis of  p. 7, item C-9
  -Divers' Air  p. 7, item C-10


Carcinogens
  -Adiprene Rubber manufacture  p. 24, item G-1
  -MOCA Controls  p. 14, item D-5
Chemical Wastes Disposal  p. 26, item I-1
Coal Tar Pitch Base Coatings  p. 23, item F-1


Dermatitis
  -Sheetmetal Workers  p. 24, item F-4
  -Trichlorotrifluoroethane  p. 24, item F-5


Fiberglass, Grinding and Finishing  p. 7, item C-11
Fluorescent Lighting Glare  p. 26, item H-1
Freon
  -Decomposition products  p. 7, item C-12
  -Leak Repair  p. 8, item C-14
  -Monitoring by Gas-Free Engineers  p. 3, item B-4 and p. 8, item C-13


Grinding Shop Dust Collection  p. 15, item D-7

Hearing Protection, Survey to Determine use of  p. 22, item E-9
Heat Stress, Architectural Aggravation of  p. 27, item J-1
Hydrogen Sulfide from Liquid Wastes Distillation  p. 13, item C-24


Industrial Health Instruction Issued  p. 3, item B-2


Labeling Standard Stock Items  p. 3, item B-5
Lead Control  p. 9, item C-16
Leaded Putty Compounds  p. 23, item F-2
Lighting
  -Distribution problems  p. 26, item H-2
  -Swing-Shift Deficiency  p. 26, item H-3


Mercaptans -- Flash Fire Warning  p. 2, item A-2
Mercury
  -Dental Department usage  p. 10, item C-18
  -Reclamation of  p. 25, item G-2
  -Salvage Hazards  p. 10, item C-19
  -Ships' Potable Water Contamination  p. 2, item A-1
  -Spills and Clean-up Procedures  p. 4, item B-6, p. 10, item C-17,
   and p. 11, item C-20
  -Wastes Disposal  p. 26, item I-2


Noise Controls in Woodworking Shop  p. 19, item E-3
Noise Levels
  -Air Hoist  p. 18, item E-1
  -High Volume Air Particle Detector  p. 20, item E-4
  -Paint Spray Booth (Water Curtain)  p. 20, item E-5
Non-potable Water Survey  p. 27, item I-3


Organic Sulfides -- Flash Fire Warning  p. 2, item A-2
Organo-tin Compounds, Adequacy of Analytical Methods  p. 2, item B-1


Paint Decomposition Products  p. 12, item C-21
Perchloroethylene Exposure  p. 15, item D-6
Personal Dosimeters for Noise Exposure Monitoring  p. 20, item E-6
Personal Protection Requirements  p. 23, item F-3
Phenolic Metal Cleaner  p. 16, item D-14
Physical Exam Program Organization  p. 2, item I-3
Plastics Machining  p. 25, item G-3
Polyvinyl Foam Insulation Ignited by Welding Operation  p. 9, item C-15
Portable Bag-type Dust Collector under Evaluation  p. 16, item D-13
Pressurized Atmospheres  p. 27, item K-1

2

Safety and Health Standards in Contract Requirements  p. 3, item B-3
Solvent Analysis, Preservation Coating Process  p. 12, item C-22
Sound Map for Facilities  p. 21, item E-8
Spectrographic Sample Preparation  p. 12, item C-23
Speech Interference Levels in Offices  p. 21, item E-7
Spray Paint Booth Problems  p. 16, item D-10


Trichloroethylene Incompatibility with Alkali  p. 25, item G-4
Trichloroethylene Vapor Degreaser  p. 15, item D-8


Ultrasonic Cleaner Malfunction  p. 22, item E-10
Urethane Foam Removal  p. 26, item G-5


Ventilation
   -Chrome Plating Operation  p. 17, item D-17
   -Electroplating Shop  p. 16, item D-9
   -Fiberglass Grinding Booth  p. 17, item D-15
   -Photography Laboratory  p. 16, item D-12
   -Tool Grinding  p. 18, item D-19


Welders' Helmets and Earmuffs  p. 22, item E-11 and item E-12

6260

BUMED-73-NER:b1
28 April 1970

From:  Chief, Bureau of Medicine and Surgery
To:    Activities Submitting Occupational Health Reports (NAVMED 576)

Subj:  Occupational Health Hazards; Release No. 63

Ref:   (a) NAVMED 23-21

Encl:  (1) List of Occupational Health Hazards (Oct through Dec 1969)

1.  The Quarterly Occupational Health Reports (MED 6260-1) for October
through December 1969, submitted in accordance with reference (a), have
been reviewed by the Occupational Health Division (Code 73).  Potential
health hazards of special interest have been selected from these reports
and are forwarded herewith as enclosure (1).

2.  The compilation contained in enclosure (1) is intended as a ready
reference to current problems and in some instances will provide useful
solutions to these problems.  They are also intended to assist Medical
Department personnel in the recognition of potentially hazardous
materials and processes.  Further information regarding specific hazards
noted in enclosure (1) may be obtained by writing the originating
activity.

3.  The information contained on the composition of material is to be
treated as manufacturer's "Discreet" proprietary information, in
accordance with SECNAVINST 5370.1A of 6 April 1957.  It is to be used
solely for the control of potentially toxic materials and is not to
be released for any other purpose.


                        J. W. Albrittain
                        Acting

Copies to:  (2 each)
HDS
Chief of Bureaus
CNO (OP-09%)
MSTS
CMC

OCCUPATIONAL HEALTH HAZARDS
Derived from Occupational Health Reports (MED-6260-1)
October 1969 through December 1969

**Release No. 63**                                      **For Official Use Only**

I. **Chemical Health Hazards and Their Control**

  A.  **Inhalation Hazards Due to Vapors, Fumes, Mists, Gases, and Dusts**

  1.  **Ammonium Picrate** - A study was made of a blending process to blend quantities of ammonium picrate which had been in storage for some time. The study showed that airborne concentrations of ammonium picrate exceeded the threshold limit value for picric acid and its salts. Bureau of Mines approved respirators for dusts significantly more toxic than lead were recommended until the operation can be relocated to an area where adequate local exhaust ventilation or supplied air masks can be provided. The recommendation was complied with. (NAD)

  2.  **Argon** - During purging of a piping system with argon gas, the argon was allowed to bleed off through a polyethylene bottle equipped with an absolute filter. The piping system involved was located in the lower levels of a submarine. The purge had been in progress for 4-6 hours at a rate of 30 cubic feet per hour. An employee entered the compartment to open a plug. When the plug was opened, a pressure drop in the system was noted indicating further escape of gas, probably a mixture of argon and nitrogen. The employee was required to change his position to accomplish his task. He attempted to crawl under an I-beam located in the lowest part of the compartment, at which time he lost consciousness. Two other employees observed his loss of consciousness. Acting rapidly and intelligently, they severed a nearby air hose with a pocket knife, entered the compartment, and directed the stream of air toward the unconscious employee. When he revived sufficiently to assist in his own movements, he was removed from under the I-beam and transported topside where he was taken to the hospital by ambulance. He recovered without ill effect. A check of oxygen concentration at this time revealed 15%. Ventilation had been installed in the area but had been removed for an unknown period of time. Remedial action includes better ventilation, use of the buddy system, more frequent check for oxygen deficiency, close observation of operations involving inert gases, and investigation of a recently developed individual oxygen deficiency monitor. This type of accident is increasing as evidenced by reports from other shipyards and the number occurring recently at this shipyard. Increased attention to the hazards of the use of inert gases is warranted. (PSNSY)

  3.  **Asbestos** - Some manufacturers of fiberglass products now use asbestos to improve the product strength and finish. This is fine, but remember that asbestos is highly toxic and stringent control is required wherever the dust may become airborne. Dry mixing of ingredients and grinding/polishing of the finished product can be especially hazardous. (Michigan's Occupational Health)

automatically closes when disconnected, and the proposed open end brass
throw away valve were tested under the same conditions. When the sub-
ject disconnected the Hansen Quick-Connect shutoff valve inside the
test chamber, alcohol vapors reached the breathing zone inside the hood
after 2 1/2 minutes. When the proposed throw away brass valve was
tested in the same manner, ethyl alcohol vapors reached the breathing
zone of the subject almost immediately. In the case of the Hansen
valve, an escape time of one minute allows a two to one safety factor.
With the proposed disposable valve, there was no margin of safety. It
was concluded that the tests showed a decided safety advantage in the
use of the Hansen Quick-Connect shutoff valve attached to the disposable
air-fed plastic hood. Use of the open end throw away valve was not
recommended. Salvage and reuse of the Hansen Quick-Connect valves are
warranted on the basis of cost, even though decontamination may be
involved. Management was highly pleased with the results of these tests
and the manner in which they were carried out. This information has
received wide dissemination to other nuclear shipyards. (PSNSY)

2. Asbestos Cutter - Assistance was given to the pipe shop in
modifying the medical cast cutter originally suggested by Portsmouth
Naval Shipyard for use in rip-out of asbestos containing lagging,
so that it will provide more effective control of asbestos dust. The
hose was lengthened, a swivel joint was installed on the vacuum cleaner
tank, and the exhaust inlet adaptor at the working head was modified
by substituting a 90° elbow, allowing greater accessibility. (MINSY)

3. Evaluation of "Push-Pull" Ventilation System - Seven open
surface tanks in our new cleaning facility in the inside machine shop
are fitted with "push-pull" type ventilation. Industrial hygiene had
reviewed and approved the drawings. The exhaust on each of the systems
was exhausting close to the designed 4800 CFM. The supply air for
each system, however, was delivering only about one-half the designed
1800 CFM. It was found that the belt had been repositioned on the
pulleys to lower the air supply rate, because the original rate created
violent surface waves in the tanks. Smoke capture studies indicated
that capture was complete at this lower rate. It was recommended that
this lower air supply rate continue to be used as long as all the
dampers are turned completely on (there are 4 on each system). Because
the hoods were not as high as the tanks were wide, they were not con-
sidered to be properly baffled. It was thus recommended that the open
mesh screen be boarded up to at least one-half its present height to
prevent natural wind drafts from interfering with the exhaust system.
(PSNSY)

4. Hydrogen Sulfide Odor - The Medical Department investigated
the complaints of hydrogen sulfide odor in the research laboratories.
In a test procedure hydrogen sulfide was deliberately released in one
of the building hoods. Within several minutes the stairway and two
adjoining labs had irritating levels of hydrogen sulfide. Examination
of the building's roof showed a multitude of short exhaust stacks dis-
charging effluents in close proximity to the roof. Smoke generators

CAPT N. E. Rosenwinkel, MC, USN - Dir., Occ. Health Div. (Code 73), BUMED
CDR S. R. Barboo, MSC, USN - Head, Ind. Hyg. & Safety Br. (Code 732), BUMED
CAPT B. K. Hastings, MC, USN - Dir., Sub. & Rad. Med. Div. (Code 74), BUMED

The items in this release are abstracted from quarterly Occupational Health
Reports submitted by naval field activities listed below.  Items in this
release are for informational purposes only and are not to be construed as
official policy of the Bureau of Medicine and Surgery or of the primary
support Bureau of the reporting activity.  Names of the senior civil service
industrial hygienists and Medical Service Corps industrial hygiene officers
and their locations are listed as an aid to readers who desire additional
detail from the authors of abstracted items.

### Civil Service Senior Industrial Hygienists

| Location | Code | Name |
|---|---|---|
| Naval Shipyard, Boston | BNSY | E. D. Storlazzi |
| Naval Shipyard, Bremerton | PSNSY | D. J. Beemer |
| Naval Shipyard, Charleston | CHSY | M. S. Qabis |
| Naval Shipyard, Long Beach | LBNSY | Sheldon Manning |
| Naval Shipyard, San Francisco Bay | SFBNSY | G. J. Rosati |
| Naval Shipyard, Norfolk | NNSY | Seymour Levinson |
| Naval Shipyard, Pearl Harbor | PHNSY | Elizabeth Steffes |
| Naval Shipyard, Portsmouth, N. H. | PoNSY | A. V. Munton |
| Naval Shipyard, Philadelphia | PNSY | V. H. Kindsvatter |
| Naval Safety Center, Norfolk | NSC | John Macetoli |
| Naval Air Station, Alameda | NASA | Oscar Sobol |
| Naval Air Station, Jacksonville | NASJ | R. E. Byrd |
| Naval Air Station, Norfolk | NASN | H. J. Worsham |
| Naval Air Station, Pensacola | NASP | P. A. Malone |
| Naval Air Station, Quonset Point | NASQP | Sal DiLustro |
| Naval Air Station, Point Mugu | NASPM | Sam Lager |
| Naval Air Station, San Diego | NASSD | Miguel Padilla |
| Naval Station, Brooklyn | NSB | Herman Schulz |
| Naval Weapons Center, China Lake | NWC | P. R. Cuykendall |
| Naval Toxicology Unit, NNMC, Bethesda | NTU | Robert A. Jones |
| Naval Research Laboratory, Washington | NRL | R. E. Nebelung |
| Naval Ordnance Station, Indian Head | NOS | Edward Borowski |
| Naval Ammunition Depot, Crane | NAD | John J. Fitch |
| Naval Undersea Research & Development Center, San Diego | | |
| Environmental Health Center, Crane | EHC | Arthur E. Johnston |

### Medical Service Corps Industrial Hygiene Officers

| Location | Code | Name |
|---|---|---|
| Preventive Medicine Unit #2, Norfolk | PMU#2 | LTJG C. W. Baker, MSC,USN |
| Preventive Medicine Unit #5, San Diego | PMU#5 | LCDR D. E. Rector, MSC,USN |
| | | LT R. L. Johnson, MSC,USN |
| Preventive Medicine Unit #6, Pearl Harbor | PMU#6 | LT J. J. Dreud, MSC,USN |
| | | ENS A. A. Stefanyshyn, MSC,USN |



DEPARTMENT OF THE NAVY
BUREAU OF MEDICINE AND SURGERY
WASHINGTON 25, D.C.

IN REPLY REFER TO

BUMED-73-jp
6260
28 Sep 1962

From:  Chief, Bureau of Medicine and Surgery
To:    Activities Submitting Occupational Health Reports (NavMed 576)

Subj:  Occupational Health Hazards; Release No. 33

Ref:   (a)  MANMED 23-21

Encl:  (1)  List of Occupational Health Hazards (April - June 1962)

1.  The Quarterly Occupational Health Hazards Reports (NavMed 576) for
April through June 1962, submitted in accordance with reference (a), have
been reviewed by the Occupational Health Division (Code 73).  Potential
health hazards of special interest have been selected from these reports
and are forwarded herewith as enclosure (1).

2.  The compilation contained in enclosure (1) is intended as a ready
reference to current problems, and in some instances will avoid duplica-
tion in the solution of these problems.  It is also intended to aid Medical
Department personnel in the recognition of potentially hazardous materials
and processes.  Further information regarding specific hazards noted in
enclosure (1) may be obtained from the originating activity.

3.  The information contained on the composition of materials is to be treated
as manufacturer's "Discreet" proprietary information, in accordance with SecNav
Instruction 5570.1A of 6 April 1957.  It is to be used solely for the control
of potentially toxic materials and is not to be released for any other purpose.

E. C. KENNEY

Copies to:  (2 each)
NDS&RCS
INSNAVMEDACTS
Chiefs of Bureaus
CNO (OP281)
MSTS
CMC

OCCUPATIONAL HEALTH HAZARDS
Derived from Industrial Health Reports
April 1962 through June 1962

<u>Release No. 33</u>                                        <u>For Official Use Only</u>

I.  <u>Chemical Health Hazards and Their Control</u>

   A.  <u>Inhalation Hazards Due to Vapors, Fumes, Mists, Gases and Dusts</u>

      1.  <u>Asbestos</u> - A study was conducted to obtain current data for
evaluating the exposure of pipecovers to asbestos containing dust.  Some
average dust counts of samples taken in the pipecoverer's shop during
routine work procedures and aboard ship during the removal of amosite from
boilers were as follows:

| In Shop | Total Dust MPPCF |
|---------|------------------|
|         | (AVG.) |
| General atmosphere | 1.7 |
| Cutting wet amosite | 5.6 |
| Cutting asbestos cloth | 1.6 |
| Cutting asbestos blocks - band saw | 77.7 |
| Wetting down amosite blanket | 5 |

| Aboard Ship | |
|-------------|--|
| General Atmosphere fireroom | 27.3 |
| Placing removed insulation in bags | 84 - 150 |
| Near completed work areas | 64.9 |

Dust concentrations found in the general atmosphere of the shop were within
permissible levels at the time of sampling.  It was estimated that the asbestos
content of the sampled air ranged from about 0.1 to 2.4 million particles per
cubic foot.  The excessive dust counts obtained aboard ship, emphasized the
need for the wearing of approved dust respirators by pipecovers.       (BNSY)

      2.  <u>Carbon Monoxide</u> - A section of the shipyard is used for testing
ordnance.  The firing tube is closed about 30 seconds after firing.  It was
reported that the residual gas in the tube contained about 36-39% carbon
monoxide.  An attempt was made to verify this statement with a Kitigawa
carbon monoxide tester.  Evacuated tubes were used for sampling the gas. The
carbon monoxide tubes were found to be too sensitive to make an accurate
estimate of the high concentration of carbon monoxide.  Carbon monoxide tubes
were completely darkened when withdrawing gas from the collection tubes for
1-2 seconds.

                                    29                Enclosure (1)

11. <u>Mercury Vapor Control</u> - A resurvey was conducted at a Test Station in reference to a potential mercury hazard. The hazard arises from the use of mercury in manometers which average seven feet in height. Occasionally a manometer blows over or is broken with the release of large quantities of mercury. The hazard is adequately controlled using the following methods;

a. Scrupulous housekeeping

b. Impervious decking

c. Mercury traps and spill pans under manometer tanks

d. Use of decontaminant HgX to clean up spills

The concentration in the work areas ranged from 0.01 mgs./cu.m. air to 0.08 mgs./cu.m. Only one area the mercury recover room, showed concentrations exceeding the hygienic level of 0.1 mg..cu.m. Atmospheric samples in this area showed levels of 0.2 to 0.3 mgs./cum. The following recommendations were made to reduce this level:

a. Resurface shelf below mercury recovery sink

b. Cover mercury catch backet

c. Seal crack in flooring. At the time of the survey, visible droplets of mercury were lodged in the crack.                    (PNSY)

12. <u>Red Dye Powders</u> - 1-methylaminoanthraquinone, a red dye, is used as a tracer in studies of the distribution of the agent charge from chemical munitions. Search of the literature developed no information to answer questions as to the carcinogenicity of this material. Correspondence with the Army Chemical Research and Development Laboratories also indicated that this compound has not been tested for carcinogenic activity. Respirators and skin protection were required for personnel loading or otherwise handling this dye.                                      (NOTS)

13. <u>Shipboard, Control of Welding Fumes and Protection of Personnel</u> - The Employees' Council asked for information concerning the adequacy of shipboard ventilation. Due to constantly changing conditions in shipboard overhaul, repair and FRAM conversions, shipyard ventilation is not always adequate. It is usually possible to obtain ample exhaust ventilation for welding operations. It is often not possible to obtain enough ventilation for burning operations. Ample protective equipment, however, such as air supply or metal fume respirators, are always available. By the use of this additional protective equipment, employees can prevent exposures which would be injurious to health.

The most commonly known health hazard is metal fume fever, which can be caused by fumes from almost any metallic oxide. Chiefly, however, the condition develops after exposure to zinc or magnesium fumes. The usual symptoms are rise in body temperature with sweating, chills and tightness of the chest. The effected person feels as if he is catching the flu. Complete recovery occurs overnight and the exposed person has no permanent effect. Persons exposed to metallic oxide fumes develop a temporary immunity to this condition. This immunity is easily lost during a weekend or vacation period.

The dispensary occasionally has cases of metal fume fever, possibly four per year. The cases are always welding or burning personnel or helpers. These persons are familiar with metal fume fever, and usually know at the time of their exposure they should obtain additional ventilation, if practical, or wear protective equipment. We do not have cases of metal fume fever from other trades, which indicated the employees will leave the area before harmful exposure.

Metallic fumes of copper, iron and tin are thought to be relatively harmless. Fumes from beryllium, lead, mercury and a few others produce harmful lasting effects in the internal organs of the body. Welders and burners can develop a lung pigmentation known as siderosis. This can develop after years of exposure to heavy concentrations of iron oxide fumes. It is a benign condition, there is no functional impairment and has no influence on pulmonary function.

Welding or burning on vinyl coatings produce extremely irritating hydrogen chloride. If the vinyl coating has not been cleaned before burning or welding, the irritation forces the employee to obtain protective equipment and ample ventilation.

Burners are occasionally subject to exposure to lead fumes due to burning on painted surfaces. These employees receive a periodic urine analysis for lead exposure. Burners and welders receive an annual chest X-ray.                                                    (LBNSY)

14.   <u>Sonar Dome Sound Dampening Material Installation, Safe Work Procedures</u> - An investigation was made of the application of sound dampening material in the form of rubber tiles to the interior surfaces of a sonar dome in the shop where the sonar dome structure was being fabricated, and in the work areas aboard the aircraft carrier in which it was to be installed. Access to the structure in the shop was through the rear which was entirely open, and through a large hatchway in the ceiling of the forward part. Exhaust ventilation was provided through the forward hatchway. Air was supplied to the interior by a compressed air line. All the largest areas had already been finished at the time of the visit. The remainder of the work was to be completed after the structure was installed on the aircraft carrier.

39                    Enclosure (1)



**DEPARTMENT OF THE NAVY**
BUREAU OF MEDICINE AND SURGERY
WASHINGTON 25, D. C.

IN REPLY REFER TO
BUMED-732-mh
6260
19 Oct 1961

From:   Chief, Bureau of Medicine and Surgery
To:     Activities Submitting Occupational Health Reports (NavMed 576)

Subj:   Occupational Health Hazards; Release No. 29

Ref:    (a)  MANMED 23-21

Encl:   (1)  List of Occupational Health Hazards (April - June 1961)

1.   The Quarterly Occupational Health Hazards Reports (NavMed 576) for
April through June 1961, submitted in accordance with reference (a),
have been reviewed by the Occupational Health Division (Code 73).  Potential
health hazards of special interest have been selected from these reports and
are forwarded herewith as enclosure (1).

2.   The compliation contained in enclosure (1) is intended as a ready
reference to current problems, and in some instances will avoid duplica-
tion in the solution of these problems.  It is also intended to aid
Medical Department personnel in the recognition of potentially hazardous
materials and processes.  Further information regarding specific hazards
noted in enclosure (1) may be obtained from the originating activity.

3.   The information contained on the composition of materials is to be
treated as manufacturer's "Discreet" proprietary information, in accord-
ance with SecNav Instruction 5570.1A of 6 April 1957.  It is to be used
solely for the control of potentially toxic materials and is not to be
released for any other purpose.

E. C. KENNEY

Copies to:   (2 each)
NDS&RCS
INSNAVMEDACTS
Chiefs of Bureaus
CNO (OP281)
MSTS
CMC

OCCUPATIONAL HEALTH HAZARDS
Derived from Industrial Health Reports
April 1961 through June 1961

Release No. 29                                     For Official Use Only

I. **Chemical Health Hazards and Their Control**

    A. **Inhalation Hazards Due to Vapors, Fumes, Mists, Gases and Dusts**

        1. **Asbestos Dust.** Survey was completed of pipe covering and insulation section. The survey included layout and cutting, molding operations, and sewing of boots and jackets. The layout and cutting are the dustiest operations in the shop. During the handling and unrolling of the asbestos, considerable dust is generated, but appears to settle rapidly. During the layout and cutting, a fine water spray is used for wetting down. Once the asbestos is wetted, the cutting causes very little dust. In addition to this control, ventilation is provided for the operation. Total dust count after wetting and cutting was 2. million particles/cubic foot.          (PNSY)

        2. **Asbestosis.** In 1958, a study was begun on pipecovers (asbestos) working conditions. Chest x-rays and vital capacity test were conducted on asbestos workers. At that time, we had one former employee receiving compensation for asbestosis. According to NCPI 792, pipecoverers are to receive a chest x-ray annually. At LBNS it was decided to give these employees a chest x-ray every six months, alternating a 70 mm with a 14x17. A vital capacity test, using McKesson-Scott equipment, has been given annually. A record has been kept of employees with "remarks" on their 14x17's. (LBNSY)

        3. **Cadmium Fumes.** Certain cable terminal sockets used aboard ship are cadmium plated as a corrosion deterrent. In securing these sockets to cable ends, it is the practice to preheat the sockets prior to pouring the molten zinc into the socket. An acetylene torch is usually utilized for this purpose. Investigation was made of this procedure aboard ship. Ventilation was provided by one five-inch exhaust duct leading to a portable exhaust fan. Air velocity appeared good, rapidly removing visible fumes. The man using the torch wore a metal fume respirator. Other personnel in the compartment did not use protective gear. During the heating of the socket, it was observed to discolor, giving evidence that the cadmium plating was being burned off. Electrostatic precipitator samples were taken and analyzed. Visible deposits resembling cadmium oxide were noted in all cases in the precipitator tubes. Analysis of the samples revealed a concentration of cadmium oxide in the inhalation zones of personnel of 2.1 and 2.4 milligrams per cubic meter of air, 21 to 24 times the threshold limit value of 0.1 milligrams per cubic meter. It was recommended that local exhaust ventilation and air-supplied respirators or metal fume respirators be used.     (PSNSY)

<u>Release No. 29</u>                                    <u>For Official Use Only</u>

\* Abbreviation in parenthesis listed throughout this Report refer to
the following stations:

| | |
|---|---|
| Naval Shipyard, San Francisco | SFNSY |
| Naval Shipyard, Mare Island | MINSY |
| Naval Shipyard, Long Beach | LBNSY |
| Naval Shipyard, Bremerton | PSNSY |
| Naval Shipyard, Boston | BNSY |
| Naval Shipyard, Portsmouth, N.H. | PoNSY |
| Naval Shipyard, New York | NYNSY |
| Naval Shipyard, Charleston | CNSY |
| Naval Shipyard, Philadelphia | PNSY |
| Naval Shipyard, Norfolk | NNSY |
| Naval Shipyard, Pearl Harbor | PHNSY |
| Naval Air Station, Alameda | NASA |
| Naval Air Station, San Diego | NASSD |
| Naval Air Station, Norfolk | NASN |
| Naval Air Station, Pensacola | NASP |
| Naval Air Station, Jacksonville | NASJ |
| Naval Air Station, Quonset Point | NASQP |
| Naval Weapons Plant, Washington, D. C. | NWP |
| Naval Ammunition Depot, Crane | NAD |
| Naval Supply Center, Oakland | NSC |
| Naval Ordnance Test Station, China Lake | NOTS |

-57-

INDEX TO "OCCUPATIONAL HEALTH HAZARDS"

Release No. 29

Aluminum cleaning, ventilation requirements, p. 38, item 1
Aluminized hoods and air-fed suits for welders, p. 42, item 15
Antimony trioxide, p. 35, item 13
Asbestos dust, p. 32, item 1
Asbestosis, p. 32, item 2

Beryllium, p. 39, item 2
Butyl cellosolve, in aluminum cleaning, p. 38, item 1

Cadmium fumes, p. 32, item 3
Cadmium fumes in silver brazing, p. 33, item 4
Carbona cleaning fluid, p. 54, item 1
Carbon dioxide, p. 40, item 5a
Chemical warfare agents, disposal of, p. 39, item 3
Chlorine gas, generated in cleaning with hypochlorite, p. 35, item 11
Chrome plating tank, p. 39, item 4
Confined space incidents -
    dust, p. 37, item 21a
    gasoline tanks, p. 38, item 21e
    methane, p. 38, item 21f
    paint, p. 37, item 21c
    sewer manhole, p. 38, item 21f
    solvent spraying, p. 37, item 21d
    trichloroethylene, p. 37, item 21d
    zinc fumes, p. 37, item 21b
Cresol vapor, p. 33, item 5

Dry ice, p. 40, item 5

Electrode wires, degreasing, p. 43, item 17
Epoxy resin accelerator, p. 34, item 7
Ethyl acetate, p. 40, item 6

Gasoline, fire, p. 34, item 9
Gasoline vapor in plane cockpit, p. 40, item 7
Graphic recording device, offensive odor in operation, p. 40, item 8



**DEPARTMENT OF THE NAVY**
BUREAU OF MEDICINE AND SURGERY
WASHINGTON 25, D.C.

FOR OFFICIAL USE ONLY

IN REPLY REFER TO

BUMED-733-mh
6260
1 May 1961

From: Chief, Bureau of Medicine and Surgery
To:   Activities Submitting Occupational Health Reports (NavMed 576)

Subj: Occupational Health Hazards; Release No. 27

Ref:  (a) MANMED 23-21

Encl: (1) List of Occupational Health Hazards (October-December 1960)

1. The Quarterly Occupational Health Hazards Reports (NavMed 576) for
October through December 1960, submitted in accordance with reference (a),
have been reviewed by the Occupational Medicine and Dispensary Division
(Code 73). Potential health hazards of special interest have been selected
from these reports and are forwarded herewith as enclosure (1).

2. The compilation contained in enclosure (1) is intended as a ready
reference to current problems, and in some instances will avoid duplica-
tion in the solution of these problems. It is also intended to aid
Medical Department personnel in the recognition of potentially hazardous
materials and processes. Further information regarding specific hazards
noted in enclosure (1) may be obtained from the originating activity.

3. The information contained on the composition of materials is to be
treated as manufacturer's "Discreet" proprietary information, in accord-
ance with SecNav Instruction 5570.1A of 6 April 1957. It is to be used
solely for the control of potentially toxic materials and is not to be
released for any other purpose.

A. S. Chrisman

A. S. CHRISMAN
Acting

Copies to:  (2 each)
NDS&RCS
INSNAVMEDACTS
Chiefs of Bureaus
CNO (OP281)
MSTS
CMC

OCCUPATIONAL HEALTH HAZARDS
Derived from Industrial Health Reports
October 1960 through December 1960

Release No. 27                                    For Official Use Only

I.   Chemical Health Hazards and Their Control

    A.   Inhalation Hazards Due to Vapors, Fumes, Mists, Gases and Dusts

        1.   Asbestos Dust.   Further samples have been taken to determine
the extent of exposure to asbestos dust by pipe coverers and insulators
working aboard ship.   Results of the samples taken are as follows:

| Operation | Dust Count-mppcf |
|---|---|
| Installation of asbestos cloth | 5.5 |
| Installation and sawing insulation block | 20.0 |
| Installation of insulation block | 3.9 |
| Sawing insulation block | 27.0 |
| Installing block insulation | 11.7 |
| Mixing magnesia cement | 5.6 |
| Sweep-up after coating asbestos on boiler | 92.5 |
| Rip-out of pipe insulation | 6.8 |

      In general, it is concluded that while cutting and installing
insulation block and when ripping out old insulation, the dust counts
usually exceed the safe concentration, assuming all the dust to be asbes-
tos.   When installing asbestos cloth and prefabricated insulation, the dust
counts generally are within acceptable limits.   It has been recommended
that pipe coverers and insulators performing dusty jobs be required to wear
dust respirators.   In some cases, it may be feasible to wet down the insu-
lating material before the work is begun, to reduce dust formation.        (4)

        2.   Carbon Monoxide.   An employee engaged in driving a pick-up
truck complained of headaches from fuel vapor escaping into the cab.   It
was found that after a 15 minute operation of the engine with the cab doors
closed carbon monoxide concentration reached 40 ppm. and combustible vapors
100 ppm.   The truck was returned to the transportation division for neces-
sary repairs to correct the above condition.                              (6)

        3.   Carbon Monoxide.   A patient sent to this dispensary from
another PRNC facility was diagnosed as having possible carbon monoxide poi-
soning.   He was working in the closed cab of a "dock mule" that had recently
been in the shop for repair, during which time the exhaust system was changed.
At 0800 the patient reported to his own medical officer exhibiting headache,
vertigo and nausea.   He was referred here at 1425 where a laboratory analysis
showed slight carboxyhemoglobinemia thus emphasizing the need for prompt lab-

-88-

INDEX TO "OCCUPATIONAL HEALTH HAZARDS"
Release No. 27


Adhesive M-29, hazards in application, p. 95, item 7
"Aero Cati-Coat," p. 94, item 5
Amestie (asbestos), fiberglass as substitute for, p. 104, item 4
Ammonium hydroxide, dermatitis from, p. 97, item 1
Asbestos dust, inhalation hazards, p. 88, item 1


Cadmium metal spray, ventilation, p. 93, item 1
Calcium hypochlorite, fire hazard of, p. 106, item 7
Carbon monoxide, p. 88, items 2, 3
Carbon tetrachloride, p. 104, item 1; p. 106, item 8
Confined space incident
    from lacquer thinner, p. 92, item B
    from 1, 1, 1 trichloroethane, p. 92, item D
    from venting of nitrogen bank, p. 91, item 14
    from welding fumes, p. 92, item 14 C
    from xylene, p. 92, E


Devran, residues in laundered clothes, p. 97, item 2
Devran, skin irritation from, p. 97, item 3
Diesel-powered shovel cab, ventilation, p. 93, item 2
Dynamic system for producing known vapor concentrations, p. 105, item 1


Electrical equipment cleaning and salvaging, control measures, p. 93,
    item 3
Electroplating, control measures, p. 94, item 4
"Envirec" instrument, construction of, p. 105, item 2
"Epocast" (epoxy resin), p. 97, item 4
Epoxy-polyamide spray paint, control measures in spraying, p. 94, item 5
Epoxy resins, dermatitis from, p. 97, item 4
Epoxy resins, skin irritation from, p. 89, item 4
Ethylene glycol monoethyl ether, in determination of tolylene
    diisocyanate, p. 105, item 3


Fiberglass, as substitute for asbestos, p. 104, item 4
Fiberglass, skin irritation from, p. 89, item 4
Foam-in place resin, ventilation control, p. 95, item 6


-110-

For Official Use Only

* Number in parenthesis listed throughout this Report refer to the following stations:

     (1)  NSY San Francisco, California
     (2)  NSY Mare Island, California
     (3)  NSY Long Beach, California
     (4)  NSY Puget Sound, Bremerton, Washington
     (5)  NAS Alameda, California
     (6)  NAS San Diego, California
     (8)  NSY Boston, Massachusetts
     (9)  NSY Portsmouth, New Hampshire
   (10)  NSY New York, New York
   (11)  NSY Philadelphia, Pennsylvania
   (12)  NSY Norfolk, Virginia
   (13)  NSY Charleston, South Carolina
   (14)  NAS Norfolk, Virginia
   (15)  NAS Pensacola, Florida
   (16)  NAS Jacksonville, Florida
   (17)  NAS Corpus Christi, Texas
   (18)  NWP Washington, D. C.
   (19)  NSY #128, Pearl Harbor, Hawaii
   (20)  NAS Quonset Point, Rhode Island
   (21)  NAD Crane, Indiana
   (22)  NSC Oakland, California
   (23)  NOTS China Lake, California

Enclosure (1)

BUMED-733-mh
6260
1 Feb 1961

From:   Chief, Bureau of Medicine and Surgery
To:     Activities Submitting Occupational Health Reports (NavMed 576)

Subj:   Occupational Health Hazards; Release No. 26

Ref:    (a) MANMED 23-21

Encl:   (1) List of Occupational Health Hazards (July through September 1960)

1.  The Quarterly Occupational Health Hazards Reports (NavMed 576) for July
through September 1960, submitted in accordance with reference (a), have
been reviewed by the Occupational Medicine and Dispensary Division (Code 73).
Potential health hazards of special interest have been selected from these
reports and are forwarded herewith as enclosure (1).

2.  The compilation contained in enclosure (1) is intended as a ready
reference to current problems, and in some instances will avoid duplica-
tion in the solution of these problems.  It is also intended to aid
Medical Department personnel in the recognition of potentially hazardous
materials and processes.  Further information regarding specific hazards
noted in enclosure (1) may be obtained from the originating activity.

3.  The information contained on the composition of materials is to be
treated as manufacturer's "Discreet" proprietary information, in accord-
ance with SecNav Instruction 5570.1A of 6 April 1957.  It is to be used
solely for the control of potentially toxic materials and is not to be
released for any other purpose.

B. W. HOGAN

Copies to:  (2 each)
NDS&RCS
INSNAVMEDACTS
Chiefs of Bureaus
CNO (OP2 1)
MSTS
CMC

OCCUPATIONAL HEALTH HAZARDS
Derived from Industrial Health Reports
July 1960 through September 1960

Release No. 26                              For Official Use Only

I.  Chemical Health Hazards and their control

   A.  Inhalation Hazards Due to Vapors, Fumes, Mists, Gases and Dusts

      1.  Asbestos.  A study is being undertaken to determine the extent of asbestos exposure in Pipe Coverers and Insulators working aboard ship.  The results of samples taken to date are as follows:

| Operation | Dust Count |
|---|---|
| Applying pipe insulation containing 10% asbestos | 1.8 million particles per cu. ft. |
| General atmosphere of engine room where insulation was being applied | 4.3 " " " " " |
| Sawing insulation blocks for catapult receivers | 14.1 " " " " " |
| Installing insulation blocks | 5.0 " " " " " |
| General atmosphere where blocks are being installed | 3.3 " " " " " |
| Breathing zone of Pipe Coverers installing insulation block | 6.2 " " " " " |
| Sawing insulation blocks | 6.1 " " " " " |
| General atmosphere near installation of lagging on pipes | 7.8 " " " " " |
| Removing steam pipe insulation | 20 " " " " " |
| Sample taken near insulation ripout | 17 " " " " " |
| Same spot as above after ripout had stopped | 12 " " " " " |

These samples indicate the possibility of excessive exposures to asbestos dust.  The study is being continued.                              (4)

-59-                    Enclosure (1)

INDEX TO "OCCUPATIONAL HEALTH HAZARDS"
Release No. 26

Ammonia, from hydrazine decomposition, p. 65, item 7
Ammonia, from paint stripping, p. 62, items 13, 14
Amosite, in cement, p. 66, item 2
Argon gas vapors, exposure to, p. 60, item 7
Asbestos, inhalation hazards, p. 59, item 1

Beryllium, p. 60, item 2
Bleach (Hypochlorite), irritation from , p. 60, item 3
Boraxo, dermatitis from, p. 66, item 1
Budd Iriditron radiographic unit, p. 73, item 2

Cadmium plating, p. 80, item 11
Calcium hydroxide, in cement, p. 66, item 2
Carbon arc burning fumes, inhalation hazard, p. 60, item 4
Carbon tetrachloride, precautions in use, p. 60, item 5
Cement (lime), dermatitis from, p. 66, item 2
Cesium 137, radiation from, p. 73, items 3,4
Chlorine gas, from burning on saran-coated surfaces, p. 63, item 15
Cholinesterase inhibitants, precautions in use, p. 78, item 1
Chromic acid mist, ventilation, p. 64, item 1
Cleaners, industrial skin, evaluation, p. 66, item 3
Cleaners, waterless hand, evaluation, p. 66, item 3; p. 67, item 7
Cobalt 60, radiation from, p. 73, item 5
Confined space incident
   from paint vapors, p. 60, item 6
   from argon gas, p. 60, item 7
Curtiss-Wright noise muffler, evaluation, p. 69, item 4, 5

Diving near sonar equipment, p. 79, item 5
Dust collection, from abrasive blasting, p. 66, item 8

Epoxy resins, dermatitis from, p. 67, item 4

Fend, protective cream, p. 66, item 3
Fire alarm, sound level study, p. 68, item 1
Fire department radioactive material program, p. 79, item 7
Foam-in-place resin, vapors, p. 61, item 8; p. 63, item 17
"Formula 214" (industrial skin cleaner), p. 66, item 3
Freon refrigerant, inhalation hazard, p. 60, item 9

Gamma evaluation devices, comparison, p. 74, item 6
General Sound Control Noise Suppressor, evaluation, p. 69, item 6
Glue, Elmer's, p. 62, item 10
Glue, Wellhold, p. 62, item 10
"Go-Jo" (industrial skin cleaner), p. 66, item 3

-65-

6 260



**DEPARTMENT OF THE NAVY**
BUREAU OF MEDICINE AND SURGERY
WASHINGTON 25, D.C.

IN REPLY REFER TO

BUMED-733-PR
A10-1/L5
15 January 1960

From:   Chief, Bureau of Medicine and Surgery
To:     Activities Submitting Occupational Health Reports (NavMed 576)

Subj:   Occupational Health Hazards; Release No. 22

Ref:    (a) MANMED 23-21

Encl:   (1) List of Occupational Health Hazards (July - September 1959)

1.  The Quarterly Occupational Health Reports (NavMed 576) for July through
September 1959, submitted in accordance with reference (a), have been re-
viewed.  Potential health hazards of special interest have been selected
from these reports and are forwarded herewith as enclosure (1).

2.  The compilation contained in enclosure (1) is intended as a ready
reference to current problems, and in some instances will help avoid
duplication in the solution of these problems.  It is also intended to
aid Medical Department personnel in the recognition of potentially hazard-
ous materials and processes.  Further detailed information regarding
specific hazards noted in enclosure (1) may be obtained from the originat-
ing activity.

3.  The information contained herein on the composition of materials is
to be treated as manufacturer's "DISCREET" proprietary information, in
accordance with SecNav Instruction 5570.1A of 6 April 1957, and is to be
used solely for the control of potentially toxic materials.  It is not to
be released for any other purpose.

4.  The request for information pertaining to the social and scientific
activities of personnel engaged in the Occupational Health Program has
been favorably received and is appreciated.  A subtitle for industrial
hygiene services provided the Fleet will be included henceforth under
the subtitle "Shipboard Industrial Hygiene Surveys and Investigations".

LLOYD B. SHONE
By direction

Copy to:  (2 copies each)
NDS&RCS
INSNAVMEDACTS
Chiefs of Bureaus
CNO (OP 281)
MSTS
CMC

OCCUPATIONAL HEALTH HAZARDS
Derived from Industrial Health Reports
July 1959 through September 1959

Release No. 22                                        For Official USE Only

1. <u>Chemical Health Hazards.</u>

A. <u>Inhalation Hazards Due to Gases, Vapors, Fumes and Dusts</u>

1. 1,1,1-Trichloroethane.  Following a Medical Admission to
the Dispensary an investigation was made on a submarine undergoing repair.
The workman involved had been preparing surfaces and brush painting with
Plasite Paint Formula No. 7144 in the Sanitary Tank which was about four
feet square and six feet deep.  No ventilation was provided to the space
and the workman had about a pint of the paint in the tank with him.  After
being in the tank approximately one hour he was found to be unconscious
and removed to the Dispensary.  A witness said that the workman was wear-
ing an organic vapor respirator at the time of his removal from the tank.

Plasite Paint contains about 35% 1,1,1-Trichloroethane.  Other
common names for this solvent are Methyl Chloroform, Vythene, Chlorothene
and Magselect.  1, 1, 1-Trichloroethane is very volatile, requiring little
heat to cause evaporation.  Plasite is an epoxy resin type paint and is
mixed with an amine hardener prior to application.  The exothermic re-
action of the mixture may have been a factor in the workmen's exposure.
The vapor is heavier than air and therefore tends to displace air in
enclosed spaces.  The organic vapor respirator worn by the workmen is
designed to remove vapors from the air when concentrations do not exceed
1,000 parts per million (ppm).  It had a knitted cotton facelet over the
contact area between the face and the mask.  In testing the efficiency
of the respirator it was noted that it was not possible to pull a vacuum
by closing off the inlets to the organic vapor cartridges.  This indica-
ted that the workman was breathing the contaminated air around the facelet.
Because of the potential hazard involved in the Plasite application it
was recommended that air supplied respirators and ventilation be provided
during such work on interior surfaces.  It was also recommended that
organic vapor respirators be used only when applying petroleum spirit type
paint vehicles and that the facelets be removed prior to issue.      (1)

2. A request was received to test the cable tanks and cones
of a cable-laying ship for oxygen content and for the presence of any
toxic or injurious gases.  The request was made because of a casualty
occurring on a similar ship operating in the Atlantic.  Oxygen valves
ranged from 5.5% to 20.4% and carbon dioxide from 11.7% down to 0.0%.
Carbon monoxide concentrations of about 5 ppm were found in one tank
and its associated cone.  Tests for hydrogen sulfide, chlorinated
hydrocarbons, arsine, phosgene, nitrous gases, and flammable vapors      (19)

--157--          enclosure (1)

label.  The Beneficial Suggestion was approved.  However, it was noted that these labels are Navy-wide in distribution and must be changed by the originator of the present system.                                           (4)

12.  A leaking drum of hydrofluoric acid Stock No. G6810-236-5671 was reported from the Supply Department bulk storage area.  Investigation revealed that 5 additional drums were potential leakers as indicated by bulging and general appearance of the drums.  These 6 drums were drawn and used by the plating shop.  Stock quantity will be limited not to exceed a normal 6 months supply with isolated storage in a well ventilated area.  Personnel in the area have initial indoctrination on potential hazards, preventive measures and first aid procedures.        (16)

13.  We are attempting to maintain a continuous health educational program for our asbestos workers.  The shop has been most cooperative in this effort.  The film, "The Air We Breath", was obtained from MSA and shown on four occasions to small groups of these employees.  This educational movie was followed by a short discussion of the hazards of breathing asbestos fibers and the use of dust respirators.            (3)

14.  A Safety Order was written providing specific instructions for the storage, use, handling, and cleanup of mercury.  In each section of the instructions it was stressed that the basic principal of controlling exposure to mercury is containment.                                       (2)

15.  A pre-operational environmental survey for background radiation levels in the Shipyard area was initiated July 1st. in preparation for future nuclear submarine overhaul.  Air, river water, potable water and rainfall samples are being collected.  The Shipyard program is coordinated with a State Health Department survey which will cover areas outside the confines of the Shipyard.  A total of 8 weeks of on-the-job training in radiation protection procedures is being received by three members of the Industrial Hygiene Division at Portsmouth Naval Shipyard in conjunction with the Nautilus overhaul.                            (13)

16.  The U. S. C. Safety Supervisor requested information about the hazards involved in cleaning up a dry spill of Calcium Hypochlorite. It was recommended that the Calcium Hypochlorite be removed by dry methods and that workmen doing the cleaning be provided with respiratory protection                                                                    (1)

B.  Personal

1.  An excellent article titled, 'Radiation Hazards Aboard A Guided Missile Cruiser", by Johnson, W., Kindsvatter, V. H., and Shaw, C. C., appeared in the United States Armed Forces Medical Journal,      (BuM)

Release No. 22                                          FOR OFFICIAL USE ONLY

VII. <u>Composition Data</u>

A.  The following data is to be treated as "Commercially Discreet"
information and is to be used for official purposes only:

1.  In accordance with SECNAV Instruction 6260.3 and BUSHIPS
Instruction 6260.3 on labelling toxic materials.  The following new
materials were introduced into the shipyard and assigned a label accord-
ingly:

<u>Penetone Formula 426</u> - cresylic acid 15%, chlorinated solvents
45% label BuSandA 9987.

<u>Pero-Klean Marine Cleaner #801</u> - high flash aromatic hydrocarbon
oil, label BuSandA 9987.

<u>Miracle Mastic Type P</u> - solvent is Petrolene, label BuSandA 9988.

<u>Hy-Temp Block Insulation</u> - diatomaceous earth 63-70%, asbestos
fiber 12-15%, no label.

<u>Foster 81-33 Fire Resistive Adhesive</u> - xylol 41.5% by volume,
alkyd short oil 23%, BuSandA 9988.

<u>Carlon PVC Cement and Primer</u> - tetrahydrofurance 66%, label
BuSandA 9988.

<u>Fabertite</u> - Contains coal tar, label BuSandA 9987.              (12)

2.  Other products:

<u>Pressure Sensitive Tape, No. 428C</u>, manufactured by the Minnesota
Mining and Manufacturing Company contains no ketones, phenols, aldehydes
or other material that would be suspected of causing skin irritation or
sensitivity.                                                          (9)

<u>Porselon #600</u> is a two component coating manufactured by Protex-
A-Cote Incorporated.  Segment #1 contains 50% resin and 50% technical
grade amyl acetate by volume.  Segment #2 contains 50% aliphatic amine
and 50% amyl acetate by volume.  The combustion products would contain
amines, carbon monoxide, carbon dioxide and cyanides.                (9)

<u>Formula 121X paint</u>.
                        This formula contains more solids than
Formula 121 and in addition contains a significant amount of tricresyl
phosphate.                                                            (4)

Release No. 22                              FOR OFFICIAL USE ONLY

\* Numbers in parenthesis listed throughout this Report refer to the
following stations:

      (1)  NSY San Francisco, California
      (2)  NSY Mare Island, California
      (3)  NSY Long Beach, California
      (4)  NSY Puget Sound, Bremerton, Washington
      (5)  NAS Alameda, California
      (6)  NAS San Diego, California
      (8)  NSY Boston, Massachusetts
      (9)  NSY Portsmouth, New Hampshire
   (10)  NSY New York, New York
   (11)  NSY Philadelphia, Pennsylvania
   (12)  NSY Norfolk, Virginia
   (13)  NSY Charleston, South Carolina
   (14)  NAS Norfolk, Virginia
   (15)  NAS Pensacola, Florida
   (16)  NAS Jacksonville, Florida
   (17)  NAS Corpus Christi, Texas
   (18)  NWP Washington, D. C.
   (19)  NSY #128, Pearl Harbor, Hawaii
   (20)  NAS Quonset Point, Rhode Island
   (21)  NAD Crane, Indiana

enclosure (1)

-107-

INDEX TO "OCCUPATIONAL HEALTH HAZARDS"
Release No. 22

Acidic gases, in decomposition of paint, p. 158, item 3
Acrylic cellulose – nitrate lacquer MIL-L-19537, p. 184, item 2
Acrylic ester base paint, p. 158, item 3
Acrylic lacquer, MIL-L-19538 (Aer), p. 184, item 2
Acrylic thinner MIL-T-19544 (Aer), p. 184, item 2
Aircosil flux, p. 184, item 2
Alcohol, p. 184, item 2
Alcohol, ethyl, p. 186
Alcohol, ethyl, denatured, p. 184, item 2
Aldehydes, in decomposition of paint, p. 158, item 3
Alkaline gases, in decomposition of paint, p. 158, item 3
Alkyd short oil, p. 183, item 1
Alodine 1200, p. 184, item 2
Aluminum alloy No. 55-56, welding of, p. 164, item 27
Aluminum alloy 61S, p. 164, item 27
Aluminum, cleaner for, p. 161, item 15
Amine hardeners, in Plasite paint, p. 157, item A-1
Amines, p. 183, item 2
Amine soap, p. 184, item 2
Amines, organic, from Devran coating, p. 158, item 4
Ammonia, p. 186
Ammonium bifluoride, p. 177, item 2
Ammonium soap, p. 184, item 2
Amyl acetate, p. 183, item 2
AN/PDR 2 radiac set, p. 175, item B-1
ANSPS/29 radar unit, p. 175, item D-1
AN/SPS-8A radar scope, p. 172, item 2
Arsine, in cable tanks and cones, p. 157, item 2
Asbestos dust, hazards (movie film), p. 179, item 13
Asbestos fiber, p. 183, item 1
Asphalt coal tar pitch, burns from, p. 166, item 6; p. 167, item 9

Battery repair shop, control of fumes, p. 162, item a
Benzene, protection against, p. 166, item 8
Benzol, in JP-4 fuel, p. 162, item 17
Black phenolic resin MIL-R-3043, p. 185
Boron, p. 184, item 2
Buffing and grinding wheels, ventilation for, p. 162, item g



**DEPARTMENT OF THE NAVY**
BUREAU OF MEDICINE AND SURGERY
WASHINGTON 25, D. C.

IN REPLY REFER TO

BUMED-733-PR
A10-1/L5
15 October 1959

From:   Chief, Bureau of Medicine and Surgery
To:     Activities Submitting Occupational Health Reports (NavMed 576)

Subj:   Occupational Health Hazards; Release No. 21

Encl:   (1)  List of Occupational Health Hazards (April 1959 - June 1959)

1.  The Quarterly Occupational Health Reports (NavMed 576) for April through
June 1959, submitted in accordance with reference (a), have been reviewed.
Potential health hazards of special interest have been selected from these
reports and are forwarded herewith as enclosure (1).

2.  The compilation contained in enclosure (1) is intended as a ready refer-
ence to current problems, and in some instances will help avoid duplication
in the solution of these problems.  It is also intended to aid Medical
Department personnel in the recognition of potentially hazardous materials
and processes.  Further detailed information regarding specific hazards
noted in enclosure (1) may be obtained from the originating activity.

3.  The information contained herein, on the composition of materials is
to be treated as manufacturer's "DISCREET" proprietary information, in
accordance with SecNav Instruction 5570.1A of 6 April 1957, and is to be
used solely for the control of potentially toxic materials.  It is not to
be released for any other purpose.

4.  The request for information pertaining to the social and scientific
activities of personnel engaged in the Occupational Health Program has
been favorably received and is appreciated. A subtitle for industrial
hygiene services provided the Fleet will be included henceforth under the
subtitle "Shipboard Industrial Hygiene Surveys and Investigations".

LLOYD B. SHONE
By direction

Copy to: (2 copies each)
NDS&RCS
INSNAVMEDACTS
Chiefs of Bureaus
CNO (OP 281)
MSTS
CMC

OCCUPATIONAL HEALTH HAZARDS
Derived from Industrial Health Reports
April 1959 through June 1959

Release No. 21                                FOR OFFICIAL USE ONLY

1.  **Chemical Health Hazards.**

   A.  **Inhalation Hazards Due to Gases, Vapors, Fumes and Dusts**

       1.  Spray painting of aircraft using the following acrylic
paint thinner composition (percentage by weight: methyl isobutyl ketone,
40%; toluene, 40%; ethylene glycol monethyl ether acetate, 20%) was re-
sponsible for causing lacrimation of the eyes of 13 exposed spray painters.
Proper maintenance of the downdraft water type exhaust grille ventilation
system greatly improved conditions.                              (20)

       2.  The use of "Dimetcote", the so-called liquid galvanizer,
has been proposed as a preservative coating for steel plate.  The use of
this coating introduces a serious potential health hazard to welders during
subsequent welding and burning operations on the coated steel.  Analyses
of air samples collected during welding on mild steel coated with Dimetcote
showed very high concentrations of both lead and zinc fume.  Up to 600
times the permissible concentration for lead and 100 times the permissible
concentration for zinc were found in the fume path at about sixteen inches
from the welding arc.  The use of air-line respirators is considered to
be mandatory if any appreciable amount of welding is done on metals coated
with Dimetcote.                                                  (19)

       3.  The first application of an epoxy-type coating was recently
accomplished when "Tarset" was applied in the bilges of a submarine.  The
potential hazards in the application of this material include systemic
poisoning by the aromatic hydrocarbons present in the solvent and thinner
and skin irritation by the epoxy resin, the amine hardener, and the coal
tar.  Complete skin and respiratory protection were provided with the
result that no ill effects were experienced by personnel applying the
coating.                                                         (19)

       4.  Because of the recent report of a case of asbestosis and
other suspected cases at a naval shipyard, an investigation was made to
determine whether there were any indications of lung disease among
employees exposed to asbestos dust.  Reports of the annual chest x-ray
examinations of twenty-six employees so exposed were reviewed for possible
findings indicative of asbestosis.  All had normal chests with the excep-
tion of one individual with a suspicious shadow that could not be related
in any way to asbestos exposure.  In order to facilitae early detection
of any pathologic changes among this group, it has been arranged for all
asbestos workers to receive 14x17 chest x-rays instead of the usual 70 mm
photofluorogram.                                                 (19)

FOR OFFICIAL USE ONLY

23.  Specifications for ventilation of trichloroethylene degreasers were made available to the U. S. Naval Air Facility, Litchfield Park, where such operations are being contemplated.                    (6)

24.  An Industrial Hygiene Survey was completed by this Station's Industrial Hygiene Division at the Naval Electronics Laboratory, San Diego, California.  The main problems were the increased use of epoxy resins, widespread presence of stray radar energy, increased use of cadmium-bearing silver solder, etc.                    (6)

Numbers in parenthesis listed throughout this report refer to the following stations:

       (1)   NSY San Francisco, California
       (2)   NSY Mare Island, California
       (3)   NSY Long Beach, California
       (4)   NSY Puget Sound, Bremerton, Washington
       (5)   NAS Alameda, California
       (6)   NAS San Diego, California
       (8)   NSY Boston, Massachusetts
       (9)   NSY Portsmouth, New Hampshire
      (10)   NSY New York, New York
      (11)   NSY Philadelphia, Pennsylvania
      (12)   NSY Norfolk, Virginia
      (13)   NSY Charleston, South Carolina
      (14)   NAS Norfolk, Virginia
      (15)   NAS Pensacola, Florida
      (16)   NAS Jacksonville, Florida
      (17)   NAS Corpus Christi, Texas
      (18)   NRP Washington, D. C.
      (19)   NSY #128, Pearl Harbor Hawaii
      (20)   NAS Quonset Point, Rhode Island
      (21)   NAD Crane, Indiana

INDEX TO OCCUPATIONAL HEALTH HAZARDS
Release No.21

Acetic acid, p.132, item 10
Acrolein, p.135, item 18
Acrylic emulsion, p.148, item 7
Alcohol, p.132, item 12
Alkali, dust, p.135, item 20
Alpha particles, exposure to, p.145, item C-1
Amine hardeners, as cause of dermatitis, p.131, item 6-a
Amines, in cleaning solutions, p.135, item 19
Ammonia, in cleaning solutions, p.135, item 19
Ammonia green scales, p.148, item 7
Ammonium maleate, p.132, item 10
Ammonium oxalate, p.148, item 7
Aniline, p.132, item 12
Anoxia, from exposure to leaded gasoline, p.136, item 22
Asbestos dust, p.130, item 4
Asphaltum, p.132, item 12

Benzene, p.132, item 12
Benzyl alcohol, p.132, item 10
Beryllium, in alloys, p.135, item 21
Butyl cellosolve, p.134, item 16
Butyl cellosolve, toxic effects, p.140, item 10

Cadmium-bearing silver solder, p.151, item 24
Carbon monoxide, from cellulose acetate-butyrate resin, p.132, item 13
Cellulose acetate-butyrate resin, p.132, item 13
Chromate, dust, p.135, item 20
Cobalt 60, p.144, item 3
Compressed air, odors in, p.137, item 24
Copper beryllium alloy, p.136
Copper 8 hydroxy quinoline, dermatitis from, p.139, item 3
Copper 8 quinolinolate, dermatitis from, p.139, item 3
Cotton duck, mildew-resistant, dermatitis from, p.139, item 3
Cresol, in cleaning solutions, p.135, item 19
Cyanide dust, health hazard, p.134, item 17; p.135, item 20

Deoxalum, aluminum cleaner, p.134, item 16
Devran coating, skin hazards, p.140, item 10
Dextrine, p.148, item 7
Dimer acid, p.148, item 5
Dimetcote, liquid galvanizer, p.130, item 2

-152-



**DEPARTMENT OF THE NAVY**
BUREAU OF MEDICINE AND SURGERY
WASHINGTON 25, D.C.

6260

IN REPLY REFER TO

BUMED-73-PR
A10-1/L5
15 July 1959

From: Chief, Bureau of Medicine and Surgery
To:   Activities Submitting Occupational Health Reports (NavMed 576)

Subj: Occupational Health Hazards: Release No. 20

Ref:  (a) MANMED 23-21

Encl: (1) List of Occupational Health Hazards ( January through April 1959)

1. The Quarterly Occupational Health Reports (NavMed 576) for January through April 1959, submitted in accordance with reference (a), have been reviewed. Potential health hazards of special interest have been selected from these reports and are forwarded herewith as enclosure (1).

2. The compilation contained in enclosure (1) is intended as a ready reference to current problems, and in some instances will help avoid unnecessary duplication in the solution of these problems. It is also intended to aid Medical Department personnel in the recognition of potentially hazardous materials and processes. Further detailed information regarding specific hazards noted in enclosure (1) may be obtained from the originating activity.

3. The information contained herein, on the composition of materials, is to be treated as manufacturer's "DISCREET" proprietary information in accordance with SecNav Instruction 5570.1A of 6 April 1957, and is to be used solely for the control of potentially toxic materials. It is not to be released for any other purpose.

4. It is further hoped that items of interest, involving social as well as scientific aspects of the program will be forwarded for inclusion in this report. Notation will be made of names, conventions, papers published, and all matters concerning the activities would be appreciated. The items of interest to those in the program will henceforth be listed under subtitle NOTES.

COPY to: (2 each)
NDS&RCS
INS&NAVMEDACTS
Chiefs of Bureaus
CNO (OP 281)
MSTS
CMC

LLOYD B. SHONE
By direction

Release No. 20                                          FOR OFFICIAL USE ONLY

OCCUPATIONAL HEALTH HAZARDS
Derived from Industrial Health Reports
January 1959 through April 1959

I.  Chemical Health Hazards

A.  Inhalation Hazards Due to Gases, Vapors, Fumes and Dusts

1.  Two cases of mild exposure to chlorine gas were investigated. It was brought to the attention of the investigator that Sodium Hypochlorite (Purex, Chlorox, etc.) was being used in conjunction with lye in certain cleaning operations.  Sodium Hypochlorite is well established as an efficient disinfection agent but when it is mixed with concentrated alkalis or concentrated acids, a rapid evolution of chlorine may result which can be a serious health hazard in confined spaces.                                      (1)

2.  A study of the personnel engaged in the handling of asbestos material at this shipyard has brought forth the following recommendations:

a.  That an education program be conducted on the potential health hazards of asbestos material.

b.  That shop supervisors issue orders and enforce the wearing of dust respirators by personnel performing shipyard lagging.

c.  That Wilson dust respirators, first tested for comfort, be furnished those engaged in asbestos work.

d.  That arrangements be made for a periodic thorough cleaning of the asbestos work rooms.

e.  That the exhaust system in the asbestos room operate continually during working hours.

The medical department has decided to make a semi-annual chest X-ray using a 14 x 17 size film on personnel exposed to asbestos fiber dust. A system is under study which would moisten the cloth before it is fabricated in the asbestos room.  It is hoped the foregoing recommendations will be of value in eliminating the potential health hazards associated with asbestos work.                                                                 (2)

3.  An investigation of complaints of respiratory irritation by an employee revealed a deficiency in his protective equipment.  The man's job consisted of dressing grinding wheels in various production shops.  His protective gear consisted of a half-mask dust respirator and protective apron.  It was discovered that the respirator's rubber flapper valve controlling the direction of inhaled air was inoperable, as the       (13)

- 113 -                        Encl: (1)

FOR OFFICIAL USE ONLY

```
 *1.  NSY San Francisco, California
  2.  NSY Mare Island, Vallejo, California
  3.  NSY Long Beach, California
  4.  NSY Puget Sound, Bremerton, Washington
  5.  NAS Alameda, California
  6.  NAS San Diego, California
  8.  NSY Boston, Massachusetts
  9.  NSY Portsmouth, New Hampshire
 10.  NSY New York, New York
 11.  NSY Philadelphia, Pennsylvania
 12.  NSY Norfolk, Virginia
 13.  NSY Charleston, South Carolina
 14.  NAS Norfolk, Virginia
 15.  NAS Pensacola, Florida
 16.  NAS Jacksonville, Florida
 17.  NAS Corpus Christi, Texas
 18.  NCF Washington, D. C.
 19.  NSY Pearl Harbor, Navy #128
 20.  NAS Quonset Point, Rhode Island
 21.  NAD Crane, Indiana
```

*    Numbers in parentheses listed throughout this report refer to the above
noted stations.

Encl: (1)

INDEX TO OCCUPATIONAL HEALTH HAZARDS QUARTERLY RELEASE
Release #20

FOR OFFICIAL USE ONLY

Accelerator EC-807, p. 122, item 3
Acetone, as solvent for rubber cement, p. 117, item 1
Alcohol, ethyl, p. 123, item 7
Alcohol, ethyl, in Turco Paint Remover, p. 115, item 9
Alcohol, isopropyl, p. 121, Sect. IV
Aluminum, noise from chipping operations, p. 119, item 7
Aluminum dust, from propeller grinding operations, p. 117, item 4
Amines, in Turco Paint Remover, p. 115 item 9
Ammonia, in Turco Paint Remover, p. 115, item 9
Ammonia fumes, in paint stripping operation, p. 114, item 4
Amyl acetate, p. 123, item 9
ANSPS-29 radar antenna, radiation from p. 118, item 1
Asbestos dust, health hazards, p. 113, item 2


Benzol, from JP-4 jet fuel, p. 115, item 8
Bituminous coating compound (G8030-275-8121) p. 117, item 5
Booster-Pumps, F9F aircraft, noise from, p. 120, item 8


Carbon monoxide in garage, p. 114, item 5
Carbon tetrachloride, p. 121, Sect. IV
Chlorine gas from sodium hypochlorite and lye, p. 113, item 1
Chlorox, p. 113, item 1
Coal tar pitch, in bituminous coating compound, p. 117, item 5
Contaminants in enclosed space, formula for concentration, p. 124-125,
    item 8
Cresol, in Turco Paint Remover, p. 115, item 9
Cresols, p. 114, item 4
Cycleweld Sealing Compounds, p. 117, item 6


Dichloromethane, p. 123, item 7
Diethylenetriamine, in sealing compounds, p. 117, item 6
Drew Oil and Grease Remover, p. 122, item 4


Ear plugs, p. 119, item 4
Enthone Stripper S-17, p. 123, item 7
Epoxy resins, hygienic practices in using, p. 117, items 6, 7
Epoxy resins, treatment of dermatitis from, p. 117, item 3
Ethyl alcohol, SEE Alcohol, ethyl


"Foam in Place" plastics, p. 117, item 7
Formica Safe-Bond Contact Cement, p. 123, item 8


Galvo fumes, as cause of metal fume intoxication, p. 115, item 11
Gamlin 265 B, p. 123, item 10
Gasoline, p. 122, item 4
Green Sensitive film, in reduction of x-ray exposure, p. 121, item B-1

-127-



**DEPARTMENT OF THE NAVY**
BUREAU OF MEDICINE AND SURGERY
WASHINGTON 25, D.C.

IN REPLY REFER TO
6 2 6
BUMED-733-PR
A13-1/L5
15 January '59

"FOR OFFICIAL USE ONLY"

From:   Chief, Bureau of Medicine and Surgery
To:     Activities Submitting Occupational Health Reports (NavMed 576)

Subj:   Occupational Health Hazards: Release No. 18.

Ref:    (a)  MANMED 23-21

Encl:   (1)  List of Occupational Health Hazards (July 1958 through Sept 1958)

1.  The Quarterly Occupational Health Reports (NavMed 576) for July through September 1958, submitted in accordance with reference (a), have been reviewed.  Potential health hazards of special interest have been selected from these reports and are forwarded herewith as enclosure (1).

2.  The compilation contained in enclosure (1) is intended as a ready reference to current problems, and in some instances will help avoid unnecessary duplication in the solution of these problems.  It is also intended to aid Medical Department personnel in the recognition of potentially hazardous materials and processes.  Further detailed information regarding specific hazards noted in enclosure (1) may be obtained from the originating activity.

3.  The information contained herein, on the composition of materials, is to be treated as manufacturer's "discreet" proprietary information in accordance with SecNav Instruction 5570.1A of 5 April 1957 and is to be used solely for the control of potentially toxic materials.  It is not to be released for any other purpose.

LLOYD B. SHONE
By direction

Copy to:  (2 copies each)
NDS&RCS
INSNAV ED CTS
Chiefs of Bureaus
CNO (OP 271)
STS
CNC

Release No. 18                              FOR OFFICIAL USE ONLY

OCCUPATIONAL HEALTH HAZARDS
Derived from Occupational Health Reports
July 1958 through September 1958


I.  Chemical Health Hazards

    a.  Inhalation Hazards Due to Gases, Vapors, and Fumes

        1.  Two employees with complaints of blurred vision, headache,
upset stomach and ringing of the ears reported to the dispensary.  These
effects had persisted for 48 hours after exposure to vapors of WD-40,
dip cleaner manufactured by Rocket Chemical, San Diego, California.
Chemical analysis indicated that WD-40 contains about 75% sec-butyl alcohol,
a light oil, and a detergent.  Excessive exposure to sec-butyl alcohol may
cause headaches, irritation of the throat, early liver degeneration, and
an increase in red blood cells.  Vapors in equilibrium with WD-40 at room
temperature were found to be approximately 90% of the lower explosive
limit.  It was recommended that the dip operation be conducted in tanks
equipped with local slot exhaust ventilation, or that the operators be
provided with air-supplied respirators.  A substitute Std. Stock Item
WF 6850-264-9037, Dry Cleaning Solvent, was also recommended.  Where
necessary, 5% isopropyl alcohol may be added to the Dry Cleaning Solvent
in order to assist in the removal of small amounts of water clinging to
metal surfaces.                                                        (1)

        2.  Several men spraying the interior of a tank with Valvoline
Tectyl #884 (MIL R 21006) were overcome and had to be hospitalized.
None of the exposed men had worn respiratory protection during approxi-
mately 3 hours of spraying.  According to the manufacturer this material
is composed essentially of high viscosity petrolatum with small amounts
of corrosion inhibitors.  No cresols, phenols, or chlorinated hydro-
carbons were found present.                                            (1)

        3.  A quantitative industrial hygiene evaluation of the battery
and plating shops was conducted.  These areas are often overlooked in
casual surveys due to the lack of dramatic incidents or obvious symptoms
of over-exposure.

            Air sampling and subsequent microchemical analysis indicated
that vapor concentrations of chromic acid over all chrome plating tanks
were within an accepted limit of 0.1 milligrams per cubic meter of air. (1)

                        -78-                    Enclosure (1)

FOR OFFICIAL USE ONLY

16. Carbon monoxide readings ranging from 10 to 200 ppm were obtained in a Naval housing unit. It was recommended that vents be installed for the gas appliances. A reevaluation indicated the absence of carbon monoxide where venting had been accomplished. (3)

17. Failure of a fan motor in a plating shop led to the discovery of a serious potential health hazard. An unlabelled tank containing cyanides was situated adjacent to a hydrochloric acid tank. The following corrective steps were taken: the cyanide tank was covered, the cyanide tank was relocated within two weeks, tanks were labelled properly, the fan motor was replaced, and the potential health hazards were reviewed with shop and division supervisors. (16)

18. Complaints of excessive dusting from the use of a band saw by employees in the insulation and lagging section of the Pipe and Copper Shop were investigated. A "Torit" dust collection system had been installed to reduce high dust concentrations generated during cutting asbestos lagging forms. The band saw cutting of "foam glass" insulation results in a heavier, high speed dust particle which was not being captured. The following recommendations were made and resulted in the elimination of complaints: (13)

(a) Frequent cleaning of the Torit filter system and associated flexible ducts. One duct was found clogged with pieces of insulation material.

(b.) The band saw speed be reduced to the lowest practical speed. High speed operation is not required for cutting "foam glass".

(c.) Vacuum clean the area to obtain improved housekeeping. (13)

19. A sample of an insulation material used as lining for gun housing, Thermobar Type I, was burned at 1000°F. and the decomposition products generated were analyzed. The sample tested was 1 inch thick with a density of 6 1/2 lbs/ft$^3$ and was manufactured by B. F. Goodrich (MIL-I-16562).

| PRODUCT EVOLVED | QUANTITY | COMMENT |
|---|---|---|
| Hydrogen Chloride | 19.3 cc/gm | uncemented |
| | 20 cc/gm | cemented |
| Carbon Monoxide | 58.5 cc/gm | |
| Sulphur Dioxide | 5.5 cc/gm | |

This material does not burn unless maintained at a temperature above 1000° F.; it ceases to burn shortly after the flame is removed. This property serves to eliminate any potential health hazard to gun crews. (18)

Enclosure (1)

FOR OFFICIAL USE ONLY

5. An adhesive asbestos compound, manufactured by the Benjamin Foster Company of Philadelphia, Pa., is used in a pipe covering process. During some applications this compound has splashed on the workers' safety glasses which if allowed to dry, is difficult to remove. In an unsuccessful attempt to find a suitable solvent which would readily remove this film from the glass, hot water and soap was found to produce the best results. This adhesive material is highly alkaline in nature (8) and the use of protective equipment for the face and hands was recommended.

6. Two employees reported to the dispensary with skin irritation and erythema. They had been removing staging from tanks painted with Komul, a coal bituminous paint which is photosensitizing. Painters who apply this material wear air-supplied hoods and use protective barrier creams. It was recommended that these same practices be followed by personnel removing staging. (3)

## II. Physical Health Hazards

### a. Exposure to Excessive Heat

1. Employees of an Electronics Shop which was recently relocated to a new windowless building complained of excessive heat and humidity. The ventilation rate in the new location provides 12 air changes per hour, and the air movement measured throughout the shop ranged from 25 to 40 linear feet per minute. A continuous temperature-humidity reorder was set up in the shop and data was recorded for two weeks at two shop locations. Data recalculated in terms of Effective Temperature (E.T.) Index indicated that during the test period 60% or more of the employees were comfortable 78% of the time. It was recommended that no major changes in the ventilation system, or expenditures to improve the shop thermal environment, be undertaken. (5)

### b. Exposure to Excessive Noise

1. Maintenance of attenuating devices in exhaust stacks for J57 engine test cells has presented a mechanical problem and involves the expenditure of a considerable amount of funds. Materials installed have not withstood the effects of corrosive materials which are the by-products of combustion, and the high temperatures prevailing during after-burner operations. A survey was conducted to determine the effects of eliminating the attenuating devices by removing the devices from one of the stacks and comparing the noise levels with a fully equipped stack by alternately operating engines under similar conditions on the two cells. An overall reduction in noise of 6 to 9 db was achieved. It was concluded that the reduction in noise level justified the time and expense of maintaining the attenuating devices in the exhaust stack. Efforts (14)

FOR OFFICIAL USE ONLY

* Numbers in parentheses listed throughout this report refer to the
following stations:

(1)  NSY San Francisco, California
(2)  NSY Mare Island, California
(3)  NSY Long Beach, California
(4)  NSY Puget Sound, Bremerton, Washington
(5)  NAS Alameda, California
(6)  NAS San Diego, California
(8)  NSY Boston, Massachusetts
(9)  NSY Portsmouth, New Hampshire
(10) NSY New York, New York
(11) NSY Philadelphia, Pennsylvania
(12) NSY Norfolk, Virginia
(13) NSY Charleston, South Carolina
(14) NAS Norfolk, Virginia
(15) NAS Pensacola, Florida
(16) NAS Jacksonville, Florida
(17) NAS Corpus Christi, Texas
(18) NGF Washington, D. C.
(19) NSY Pearl Harbor, T. H.
(20) NAS Quonset Point, Rhode Island
(21) NAD Crane, Indiana

-96-                    Enclosure (1)

INDEX TO "OCCUPATIONAL HEALTH HAZARDS" - 1958

AN/SGG-40 radar set, p. 92, item 5
Aircraft altimeters, testing of, p. 79, item 6
Alpha rays, exposure to, p. 88, item, c
Ammonia, p. 80, item 9
Ammonia, threshold limit, p. 95, item 15
Ammonium hydroxide, p. 80, item 9; p. 91, sect. V, item 4
Aniline, threshold limit, p. 95, item 15
Antimony salt, p. 94, item 13
Arabol cement, p. 91, sect. V, item 1
Asbestos adhesive compound, p. 85, item 5
Asbestos dust, p. 82, item 18

Batteries, submarine, p. 79, item 3
Battery shops, industrial hygiene evaluation, p. 78, item 3
Beryllium phosphors in fluorescent tubes, p. 93, item 13
sec-Butyl alcohol, p. 78, item 1

Calcium lead, p. 94, item 13
Calcium lead silicate, p. 94, item 13
Calcium lead tungstate, p. 94, item 13
Calcium poly-sulfide, p. 81, item 10
Carbon monoxide, p. 81, item 15; p. 82, items 16, 19;
     p. 91, sect. VI, item 2
Carbon tetrachloride, p. 90, sect. IV
Ceramic tile adhesive CTA-21, p. 91, sect. V, item 5
Cesium 137, p. 89, item 2; p. 89, item d,3
Chlorine, in swimming pool, p. 83, item 20
Chlorine trifluoride, threshold limit, p. 95, item 15
Cholinesterase, determination of, p. 93, item 12
"Cholinesterase Tests and Their Applicability in the Field",
     by Hamblin and Golz, p. 93, item 12
Chrome dermatitis, p. 84, item 4
Chromic acid, p. 78, item 3
Cobalt 60, p. 89, item 2; p. 89, item a,3
Cyanide, p. 79, item 4
Cyanide tank, p. 82, item 17

Davcon, plastic steel, p. 90, sect. IV
Decaborane, threshold limit, p. 95, item 15
Diborane, threshold limit, p. 95, item 15
Difluorodibromomethane, threshold limit, p. 95, item 15
Dry Cleaning Solvent, WF 6850-264-9037, p. 78, item 1